# ARMSTRONG *v.* AMERICAN EXCHANGE NATIONAL BANK OF CHICAGO.

## SAME *v.* SAME.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

Nos. 1110, 1111. Submitted January 13, 1890. — Decided March 3, 1890.

On June 14, 1887, the Fidelity National Bank of Cincinnati drew a draft for $100,000 on the Chemical National Bank of New York City, payable to the order of the American Exchange National Bank of Chicago, and put it into the hands of one W., who delivered it for value to K. & Co. They endorsed it for deposit to their account in the Chicago Bank, which credited its amount to them and paid their checks against it. It was not paid: *Held,* that the draft was a foreign bill of exchange; that W. did not act as the agent of the Cincinnati Bank; and that in a suit by the Chi-

cago Bank against the receiver of the Cincinnati Bank, which had failed, to recover the amount of the draft, the Chicago Bank was a *bona fide* holder and owner of it for value, and want of consideration could not be shown by the receiver.

The fact that the draft was payable to the order of the plaintiff was not notice to it that W. was not its purchaser or remitter; and the Cincinnati Bank had represented to the plaintiff that W. was a *bona fide* holder of the draft, for his use in making good trades of his with K. & Co.

An instrument signed by the Cincinnati Bank, dated June 14, 1887, addressed to the Chicago Bank, stating that W. & Co. had deposited $200,000 to the credit of the latter bank, for the use of K. & Co., was put by the former bank into the hands of W. & Co., who delivered it to K. & Co., who deposited it with the Chicago Bank, which gave credit for its amount to K. & Co. as cash, and paid with a part of it an overdraft of K. & Co. and honored their checks against the rest of it. In a suit by the Chicago Bank against the said receiver to recover the $200,000: *Held*, that the instrument was in its legal character a certificate of deposit; that the plaintiff was an innocent purchaser of it, for value; that, as the Cincinnati Bank had represented to the plaintiff that it had received from W. & Co. consideration for the paper, it was estopped from setting up the falsity of such representation; that the plaintiff did not take the paper under such circumstances as would put a man of ordinary prudence on inquiry; and that there was nothing to lead the plaintiff to suspect that the money represented by the paper was that of the Cincinnati Bank.

A defence set up to the suit on the certificate of deposit was, that H. (the vice-president of the Cincinnati Bank), its assistant cashier, and W., of W. & Co., conspired to defraud that bank by using its funds in speculating in wheat in Chicago, through K. & Co., so as to make a " corner" in wheat: *Held*, that rumors on the board of trade and in the public press that H. was the real principal for whom W. was acting, could not affect the plaintiff; and that the plaintiff could not refuse to honor the checks of K. & Co. against the deposit, on the ground that K. & Co. intended to use the money to pay antecedent losses in the gambling wheat transactions.

The statute of Illinois, 1 Starr & Curtis, Stat. 1885, pp. 791, 792, §§ 130, 131, and the case of *Pearce* v. *Foote*, 113 Illinois, 228, do not apply to the present case.

Where losses have been made in an illegal transaction, a person who lends money to the loser, with which to pay the debt, can recover the loan, notwithstanding his knowledge of the fact that the money was to be so used.

An obligation will be enforced, though indirectly connected with an illegal transaction, if it is supported by an independent consideration, so that the plaintiff does not require the aid of the illegal transaction to make out his case.

It does not appear that the plaintiff had knowledge or notice that the paper in suit was delivered to it to be used through it by K. & Co. in connection with an attempt to corner the market.

Where a dividend was declared by the receiver in October, 1887, the plaintiff is entitled to interest on the amount of his dividend from the time it was declared.

IN EQUITY. Decree in favor of the complainant. The defendant appealed. The case is stated in the opinion.

*Mr. John W. Herron*, for appellant, cited: *White* v. *Knox*, 111 U. S. 784 ; *Vorce.*v. *Rosenbery*, 12 Nebraska, 448 ; *Chariton Plough Co.* v. *Davidson*, 16 Nebraska, 374 ; *Aldrich* v. *Stockwell*, 9 Allen, 45 ; *Kyle* v. *Thompson*, 11 Ohio St. 616 ; *Tisen* v. *Hanford*, 31 Ohio St. 193 ; *Weber* v. *Orton*, 91 Missouri, 677 ; *Trust Co.* v. *National Bank*, 101 U. S. 68 ; *Pollard* v. *Vinton*, 105 U. S. 7 ; *Farmers' and Mechanics' Bank* v. *Butchers' Bank*, 16 N. Y. 125 ; *S. C.* 69 Am. Dec. 678 ; *Baxendale* v. *Bennett*, 3 Q. B. D. 525 ; *Stewart* v. *Lansing*, 104 U. S. 505 ; *Marion County* v. *Clark*, 94 U. S. 278 ; *Pearce* v. *Foote*, 113 Illinois, 228 ; *Coffman* v. *Young*, 20 Ill. App. 76 ; *Raymond* v. *Leavitt*, 46 Michigan, 447 ; *Brown* v. *Tarkington*, 3 Wall. 377 ; *Chapin* v. *Dake*, 57 Illinois, 295 ; *Third Nat. Bank* v. *Harrison*, 3 McCrary, 316 ; *Cunningham* v. *Third Nat. Bank of Augusta*, 71 Georgia, 400 ; *Dresser* v. *Missouri & Iowa Construction Co.*, 93 U. S. 92 ; *Williams* v. *Smith*, 2 Hill, 301 ; *White* v. *Knox*, 111 U. S. 784 ; *Bank of Bethel* v. *Pahquioque Bank*, 14 Wall. 383 ; *Chemical Bank* v. *Bailey*, 12 Blatchford, 480.

*Mr. C. B. Matthews* and *Mr. W. H. Swift*, for appellee, cited : *Munroe* v. *Bordier*, 8 C. B. 861 ; *Watson* v. *Russell*, 3 B. & S. 34 ; *South Boston Iron Co.* v. *Brown*, 63 Maine, 139 ; *Glascock* v. *Rand*, 14 Missouri, 550 ; *Horn* v. *Fuller*, 6 New Hampshire, 511 ; *St. Louis & San Francisco Railway Co.* v. *Johnston*, 23 Blatchford, 489 ; *S. C.* 27 Fed. Rep. 243 ; *Bank of Circleville* v. *Bank of Monroe*, 33 Fed. Rep. 408 ; *In re Bank of Madison*, 5 Bissell, 515 ; *Clark* v. *Merchants' Bank*, 2 Comstock, 380 ; *In re Franklin Bank*, 1 Paige, 249 ; *S. C.* 19 Am. Dec. 413 ; *Platt* v. *Beebe*, 57 N. Y. 339 ; *Metropolitan Bank* v. *Loyd*, 90 N. Y. 530 ; *Bank of the Republic* v. *Millard*, 10 Wall. 152 ; *Brooks* v. *Bigelow*, 142 Mass. 6 ; *Commercial Bank* v. *Mil-*

*ler,* 77 Alabama, 168 ; *Flannery* v. *Coates,* 80 Missouri, 444; *In
re Carew's Estate,* 31 Beavan, 39 ; *Ex parte Richdale,* 19 Ch. D.
409 ; *Hudson Canal Co.* v. *Pennsylvania Coal Co.,* 8 Wall.
276 ; *Long* v. *Straus,* 107 Indiana, 94 ; *Miller* v. *Austen,* 13
How. 218 ; *Curtis* v. *Leavitt,* 15 N. Y. 9 ; *Leavitt* v. *Palmer,*
3 Comst. 19 ; *S. C.* 51 Am. Dec. 333; *Barnes* v. *Ontario Bank,*
19 N. Y. 152 ; *Bank of Peru* v. *Farnsworth,* 18 Illinois, 563 ;
*Laughlin* v. *Marshall,* 19 Illinois, 390 ; *Hunt* v. *Divine,* 37
Illinois, 137 ; *White* v. *Franklin Bank,* 22 Pick. 181 ; *Hart* v.
*Life Association,* 54 Alabama, 495 ; *Kilgore* v. *Bulkley,* 14
Connecticut, 362 ; *Lindsey* v. *McClelland,* 18 Wisconsin, 481 ;
*S. C.* 86 Am. Dec. 786 ; *Bank of Chillicothe* v. *Dodge,* 8 Barb.
233 ; *Poorman* v. *Mills,* 35 California, 118 ; *S. C.* 95 Am. Dec.
90 ; *Hazelton* v. *Union Bank,* 32 Wisconsin, 34 ; *Trip* v. *Cortenius,* 36 Michigan, 494 ; *Bean* v. *Briggs,* 1 Iowa, 488 ; *S. C.*
63 Am. Dec. 464 ; *Howe* v. *Hartness,* 11 Ohio St. 449 ; *S. C.*
78 Am. Dec. 312 ; *Cummings* v. *Gassett,* 19 Vermont, 308 ;
*Hussey* v. *Winslow,* 59 Maine, 170 ; *Fleming* v. *Burge,* 6
Alabama, 373 ; *Blood* v. *Northrup,* 1 Kansas, 28 ; *Nelson* v.
*First Nat. Bk. of Chicago,* 48 Illinois, 36 ; *S. C.* 95 Am.
Dec. 510 ; *Grissler* v. *Powers,* 81 N. Y. 57 ; *Armstrong* v.
*Tyler,* 11 Wheat. 258 ; *McBlair* v. *Gibbes,* 17 How. 232 ;
*Kinsman* v. *Parkhurst,* 18 How. 289 ; *Brooks* v. *Martin,* 2
Wall. 70 ; *Railroad Co.* v. *Durant,* 95 U. S. 576.

Mr. JUSTICE BLATCHFORD delivered the opinion of the court.

These are appeals by David Armstrong, receiver of the
Fidelity National Bank of Cincinnati, Ohio, from decrees rendered against him by the Circuit Court of the United States
for the Southern District of Ohio, in two suits in equity,
brought against him in that court by the American Exchange
National Bank of Chicago, Illinois. The first case will be
referred to as No. 1110, and the second case as No 1111.

No. 1110 was commenced on the 5th of November, 1887,
by a petition, which was demurred to by the defendant. The
demurrer was overruled, the defendant answered the petition,
and there was a replication to the answer. Then, by leave of

the court, a bill in equity was filed in place of the petition. The bill sets forth the following facts: The plaintiff is a corporation under the laws of the United States, doing a general banking business in Chicago, Illinois. The defendant is the receiver of the Fidelity National Bank of Cincinnati, Ohio, a corporation created under the laws of the United States, which did a general banking business in Cincinnati, Ohio. On the 15th of June, 1887, the plaintiff became the owner and holder of a draft drawn by the Fidelity Bank on the Chemical National Bank of the city of New York, a copy of which, with all credits and endorsements thereon, is as follows:

"The Fidelity National Bank.

"$100,000.00.  CINCINNATI, *June* 14, 1887.  No. 16,412.

"Pay to the order of American Exch'ge Nat. B'k, Chicago, one hundred thousand dollars.

"BENJ. E. HOPKINS,
"*As. Cas. Cashier.*

"To the Chemical National Bank, New York City."

Endorsed: "Without recourse. A. L. Dewar, cashier. Dep. acct. C. J. Kershaw & Co.  C. J. Kershaw & Co.  Pay American Exchange Nat. Bank, New York, account of American Exchange Nat. Bank of Chicago, 15 June, 1887. A. L. Dewar, cash."

At the time the draft was drawn, Benjamin E. Hopkins was the assistant cashier of the Fidelity Bank, and by its authority the signature, "Benjamin. E. Hopkins, As. Cas.," was used for the signature of that bank. Within a reasonable time after the plaintiff became the owner of the draft, to wit, on June 17, 1887, it was presented to the drawee for payment, which was refused. It was protested for non-payment, and notice of the demand, refusal, and protest was forthwith given to the Fidelity Bank; and thereupon that bank became liable to the plaintiff in the sum of $100,000, with interest from June 17, 1887. After the draft was drawn and the plaintiff had become its owner, the Fidelity Bank, without the knowl-

edge of the plaintiff, ordered the drawee not to pay the draft; and the drawee, in refusing to pay it, was acting in accordance with such instructions. On the 27th of June, 1887, the Comptroller of the Currency of the United States, acting under the statute, appointed the defendant receiver of the Fidelity Bank. On the 12th of July, 1887, a decree was rendered by the Circuit Court of the United States for the Western Division of the Southern District of Ohio, in a proceeding instituted by such Comptroller against the Fidelity Bank, adjudging that its franchises had been forfeited and declaring it to be dissolved. In September, 1887, the claim of the plaintiff was presented to the receiver in due form, but he rejected it.

.. The prayer of the bill is for a decree that such claim for $100,000, with interest from June 17, 1887, to June 27, 1887, is a valid claim against the estate in the hands of the defendant as receiver, and that he be directed to satisfy it by paying dividends upon it from the assets of the Fidelity Bank; and for general relief.

The defendant answered the petition, and, after the bill was filed, it was ordered that such answer stand for an answer to the bill, and that the replication which had been filed to it stand also.

The defence set up in the answer is that the plaintiff is not the owner of the draft; that it was signed by Hopkins, and came into the possession of the plaintiff, without any consideration paid for it by the plaintiff to the Fidelity Bank; and that that bank never received any consideration from any person for it, and is not indebted to the plaintiff on account of it.

It was admitted of record that the draft was presented to the drawee within the reasonable time allowed by law, that payment was refused, that it was protested for non-payment and that notice of demand, refusal, and protest was given in due time to the Fidelity Bank; and also that the defendant, on October 31, 1887, declared, and has paid, a dividend of 25 per cent on all claims against the Fidelity Bank and the receiver, approved or adjudicated as valid claims.

Besides cases Nos. 1110 and 1111, a third suit was brought, and testimony was taken in all three of them at the same time. It was stipulated of record that all depositions taken or to be taken in any one of the three cases might be read by either party in all of them.

After a hearing on pleadings and proofs, a decree was entered on the 3d of December, 1888, in No. 1110, setting forth that, on the 15th of June, 1887, the plaintiff became and had ever since been the owner of the draft in question; that it was duly presented to the drawee and payment refused, and the Fidelity Bank had due notice; that the claim was duly presented to the receiver and rejected; that it is a just and valid claim, and should have been allowed by him; that the plaintiff is a *bona fide* holder of the draft for a valuable consideration before maturity, without notice of any want of consideration, free from all equities or defences whatsoever; and directing the defendant to allow the claim as one for the full amount of $100,000 against the assets in his hands as receiver, to satisfy it by paying such dividends as had been made theretofore and as should be made thereafter from the assets of the Fidelity Bank in due course of administration, and to pay the dividend of 25 per cent already declared October 31, 1887, with interest from that date until the date of payment, and also the costs of the suit. From that decree the defendant has appealed.

No. 1111 was commenced by a petition filed on the 5th of November, 1887, which was demurred to and the demurrer was overruled. The defendant then answered the petition, a replication was filed to the answer, and then leave was granted to the plaintiff to file a bill in equity instead of the petition. That bill sets forth as follows, in addition to the same formal matters set forth in the bill in No. 1110: On the 14th of June, 1887, the Fidelity Bank issued a certificate of deposit, or letter of advice, addressed to the plaintiff, of which the following is a copy:

"Briggs Swift, president; E. L. Harper, vice-president; Ammí Baldwin, cashier; Benj. E. Hopkins, ass't cashier.
"U. S. depository. The Fidelity National Bank. Capital, $2,000,000.00; surplus, $400,000.00.

"CINCINNATI, *June 14th*, 1887.
."The American Exchange National Bank, Chicago, Illinois.
"Gentlemen: Messrs. Wilshire, Eckert & Co. have deposited two hundred thousand ($200,000.00) dollars to your credit for the use of C. J. Kershaw & Co.
"Respectfully yours,
BENJ. E. HOPKINS, *As. Cas.*"

At the time this certificate of deposit was issued, Benjamin E. Hopkins was the assistant cashier of the Fidelity Bank, and his signature, "Benj. E. Hopkins, As. Cas.," was used as the signature of that bank. The certificate was delivered by it to the plaintiff on the 15th of June, 1887, and the plaintiff has owned it ever since. On the faith thereof, the plaintiff, at the request of said C. J. Kershaw & Co., on said 15th of June, paid to said C. J. Kershaw & Co., and upon their orders, the full amount of $200,000, and by means thereof became entitled to recover from the Fidelity Bank the full amount of the certificate. On June 18, 1887, the plaintiff presented the certificate to the Fidelity Bank, at its banking office in Cincinnati, and demanded payment thereof, which was refused. The plaintiff became indebted to the Fidelity Bank in the sum of $1302.77, for a balance on general account. After deducting such balance, there was due from the latter to the plaintiff, at the time of such demand, $198,697.23, which amount is still due, with interest from June 18, 1887. In September, 1887, that claim was presented to the defendant for allowance, but he rejected it.

The prayer of the bill is for a decree that the claim, amounting to $198,697.23, with interest from June 18, 1887, to June 27, 1887, is a valid claim against the assets in the hands of the defendant as receiver, and that he be directed to satisfy it by paying dividends upon it from the assets of the Fidelity Bank in due course of administration.

The answer to the petition and the replication thereto were ordered to stand in respect to the bill, and like stipulations were made as in case No. 1110.

The defence set up in the answer is as follows: One Joseph Wilshire was a member of the firm of Wilshire, Eckert & Co. E. L. Harper, Benjamin E. Hopkins (the assistant cashier of the Fidelity Bank) and Wilshire conspired to defraud the Fidelity Bank. Harper, Hopkins and Wilshire, with other persons, were, at and before the 14th of June, 1887, engaged in what is called "a deal" in wheat, which is speculating in wheat, in Chicago, by buying very large amounts of wheat on paying a margin or percentage of the purchase price, and entering into contracts for future delivery to them of wheat in large quantities, upon which contracts they were advancing and paying a margin or part of the price of the wheat. The object of the speculation and purchase under the contracts was to enable said parties to own and control all the wheat then in Chicago or to arrive within the time of the performance of the contracts, and thereby to create what is called a "corner" in the market; that is to say, by contracting for the purchase and delivery of more wheat than exists and can by any possibility be delivered, to create a fictitious value or price therefor, effect an advance in the market price of wheat in Chicago, and realize a profit thereon to Harper, Hopkins and Wilshire, and such other persons as might be engaged with them in the speculation. Harper, Hopkins and Wilshire conspired together unlawfully to abstract from the Fidelity Bank its money and to embezzle its funds in the possession or control of Harper and Hopkins as its officers, and, by drawing bills of exchange and other evidences of indebtedness in the name of the bank, to use its credit and resources for their own benefit, not in the prosecution of its legitimate business, but in the purchase of wheat in Chicago and contracts for the future delivery of wheat, in the prosecution of said unlawful speculation. The letter of advice addressed to the plaintiff, set forth in the bill, was signed by Hopkins and delivered by Harper to Wilshire, in the execution of the scheme to abstract the funds of the bank and unlawfully use its credit in the speculation in wheat, and for no

other purpose. Wilshire, Eckert & Co. did not deposit any part of the $200,000 mentioned in the letter of advice, in the Fidelity Bank, to the credit of the plaintiff, for the use therein expressed. The letter was unlawfully and fraudulently addressed to the plaintiff, when in fact no money had been deposited by any person to the credit of the plaintiff with the Fidelity Bank, and in the execution of said scheme. At the time of the alleged delivery of the letter of advice to the plaintiff, it had notice that Harper, Hopkins and Wilshire were engaged in said speculation, and were using the credit and funds of the Fidelity Bank unlawfully for such purpose, and that the letter of advice was written and signed for such purpose, and delivered to Wilshire and by him to the plaintiff, to be used by and through the plaintiff, and by C. J. Kershaw & Co., who were, and to the plaintiff were well known to be, brokers, in the purchase of wheat for the account of Wilshire and his confederates, and had full knowledge that the purchases were in the execution of an unlawful combination to control the market for wheat and thereby enhance the value thereof in Chicago. The terms of the agreement between Wilshire, representing the firm of Wilshire, Eckert & Co., and his confederates, and the circumstances connected therewith, were such that the plaintiff was put upon inquiry, and could not and did not *bona fide* make advances to C. J. Kershaw & Co., nor become entitled to receive from the Fidelity Bank any part of the amount of such advances, and, if made by the plaintiff, they were not made in the regular course of business, but in bad faith and with such notice. The Fidelity Bank did not become indebted to the plaintiff in any amount, and the claim is not a valid one and ought not to be allowed.

On the 3d of December, 1888, after a hearing on pleadings and proofs, a decree was made setting forth that, on the 15th of June, 1887, the plaintiff became the owner of the certificate of deposit or letter of advice set out in the bill; that, on the faith thereof, and without notice of the matters set forth in the answer, the plaintiff, on the 15th of June, 1887, advanced to C. J. Kershaw & Co. the full amount of $200,000, and by reason thereof then became entitled to recover from the Fidel-

ity Bank the full amount of the certificate; that, on the 18th of June, 1887, the plaintiff presented the certificate to the Fidelity Bank and demanded payment thereof, which was refused; that, after the Fidelity Bank became indebted to the plaintiff in said sum of $200,000, the plaintiff became indebted to the Fidelity Bank, in the sum of $1302.77, being a balance due on general account; that, after ded cting such balance, there was due from the Fidelity Bank, at the time of such demand, $198,697.23; that the claim therefor was presented to the defendant and rejected; and that the plaintiff is a *bona fide* holder of the certificate, for valuable consideration, without notice of any want of consideration, and free from any equities or defences whatsoever. The decree adjudges that the claim is a valid claim for $198,697.23 against the assets in the hands of the defendant as receiver, and directs him to satisfy the same by paying thereon such dividends as had been made theretofore, and should be made thereafter, from the assets of the Fidelity Bank, in due course of administration, and to pay the dividend of 25 per cent already declared, October 31, 1887, with interest from that date until the time of payment, and also the costs of the proceeding. From this decree the defendant has appealed.

Case No. 1110 will be first considered. The receiver contends that the draft is not a valid claim against the funds in his hands; that there was no endorsement of it by the plaintiff, which was the payee, to a *bona fide* holder; that the draft came into the possession of the plaintiff without any consideration being paid therefor by it to the Fidelity Bank, and that bank never received any consideration from any person for it; and that the plaintiff does not occupy the position of an endorsee of it for value.

The facts in evidence, as we understand them, are these: The draft numbered 16,412 was deposited with the plaintiff by one of its regular customers, C. J. Kershaw & Co., on June 15, 1887, and was endorsed by the plaintiff's cashier and by that firm for deposit, thus: "Dep. acct. C. J. Kershaw & Co. C. J. Kershaw & Co." This draft was endorsed over on the same day by the plaintiff to the American Exchange National Bank of

New York, for collection for account of the plaintiff, and was duly presented to the drawee on the 17th of June, 1887. Payment was refused, the draft was duly protested and returned to the plaintiff, and notice of protest was duly given to the drawer. Another draft for $100,000, numbered 16,413, and not involved in either of the suits Nos. 1110 and 1111, was drawn by the Fidelity Bank on the Chemical National Bank of New York City to the order of C. J. Kershaw & Co., and was endorsed and deposited with the plaintiff by that firm on June 15, 1887. It also was sent forward, payment was refused, it was protested, and notice was given to the drawer. A claim for its amount having been rejected by the receiver, a suit was brought on it by the plaintiff against the receiver, and a decree was rendered in favor of the plaintiff for its full amount. The third suit was No. 1111.

The plaintiff and the Fidelity Bank were corresponding banks, and made collections for each other. The copartnership of C. J. Kershaw & Co. was composed of Charles J. Kershaw and Hamilton Dewar, as general partners, and Charles B. Eggleston, as special partner. It was engaged in the grain commission business on the board of trade in Chicago, and kept its sole bank account with the plaintiff. In March, 1887, and before that time, it began to purchase wheat on orders from Wilshire, Eckert & Co., who were commission merchants in Cincinnati; and it was buying wheat also for J. W. Hoyt, another commission merchant in Cincinnati. It did not know the principals for whom Wilshire, Eckert & Co. and Hoyt were acting, and did not know until the 30th of May that they were acting for the same principal. It was the custom of Wilshire, Eckert & Co. to transfer money to Kershaw & Co., for such purchases, by advising the latter that a certain sum had been deposited in bank in Cincinnati to their credit, and Kershaw & Co. then drew a draft against such deposit, and deposited the draft to their own credit with the plaintiff. Kershaw & Co. selected the Fidelity Bank as the bank in which they wished the funds to be deposited. After the two banks became correspondents, money was transmitted also by certificates of deposit, substantially like the one in No. 1111; and, prior to the

15th of June, 1887, the Fidelity Bank had issued and sent to the plaintiff four such certificates, on printed forms, reading as follows — the written portions being in italics:

" The Fidelity National Bank.

" CINCINNATI, *April 28th*, 1887.

" *A. L. Dewar*, Esq., Cashier *American Exchg. Nat.,
Chicago, Ills.*

" Dear Sir: We credit your account *twenty-five thousand* dollars, received from *Wilshire, Eckert & Co.*, for the use of *C. J. Kershaw & Co.*

" Respectfully yours,

" *$25,000.*      *Ammi Baldwin*, Cashier."

[On the margin:] " Letter of advice."

[Written across the face:] " *Same telegraphed this date.*"

" The Fidelity National Bank.

" CINCINNATI, *Apl. 28th*, 1887.

" *A. L. Dewar*, Esq., Cashier *American Ex. Natl. Bk.,
Chicago, Ills.*

" Dear Sir: We credit your account *one hundred and three thousand* dollars, received from *C. J. Kershaw & Co., $50,000 wired, $53,000 wired*, for the use of *C. J. Kershaw & Co.*

" Respectfully yours,

" *$103,000.00.*      *E. L. Harper, V. P.*"

[On the margin:] " Letter of advice."

" The Fidelity National Bank.

" CINCINNATI, *April 29th*, 1887.

" *A. L. Dewar*, Esq., Cashier *American Exchg. Nat. Bk.,
Chicago, Ills.*

" Dear Sir: We credit your account *twenty-five thousand* dollars, received from *Wilshire, Eckert & Co.*, for the use of *C. J. Kershaw & Co.*

" Respectfully yours,

" *$25,000.*      *Ammi Baldwin*, Cashier."

[On the margin:] "Letter of advice."

[Written across the face:] "*Same telegraphed you this date, under our special telegraphic code.*"

"The Fidelity National Bank.

"CINCINNATI, *April 30th*, 1887.

"*A. L. Dewar*, Esq., Cashier, *Chicago, Ills.*

"Dear Sir: We credit your account *one hundred thousand* dollars, received from *Wilshire, Eckert & Co.*, for the use of *C. J. Kershaw & Co.*

"Respectfully yours,

"*$100,000.*                              *Ammi Baldwin*, Cashier."

[On the margin:] "Letter of advice."

[Written across the face:] "*Same telegraphed you this date.*"

These certificates were issued for five different deposits made with the Fidelity Bank to the credit of the plaintiff, for the use of Kershaw & Co. The Fidelity Bank sent to the plaintiff a telegram announcing each of such deposits, the telegrams being as follows:

"CINCINNATI, O., 28.

"*To Am'n Ex. Nat. Bk.*

"Wilshire, Eckert & Co. deposit with us for your credit, use C. J. Kershaw & Co., twenty-five thousand dollars.

"FIDELITY N. BANK."

"4 — 28.

"*To American Ex. Nat. Bank.*

"Kershaw & Co. have placed to your credit fifty thousand dollars.                              FIDELITY NATIONAL BANK."

"CINCINNATI, O., 28.

"*To American Ex. Nat. Bank.*

"Kershaw & Co. have placed to your credit fifty-three thousand additional.                    FIDELITY NAT. BANK."

"CINCINNATI, O., 29.

" *To Am. Ex. Nat. Bk.*

"Wilsbire, Eckert & Co. deposit to your credit for the use of C. J. Kershaw & Co., $25,000.     FIDELITY N. BANK."

"CINCINNATI, O., 30.

" *To American Exchange Natl. Bank, Chicago.*

"Wilshire, Eckert & Co., deposit to your credit for the use of C. J. Kershaw. & Co., $100,000.     FIDELITY NATL. BANK."

On the 2d of May, 1887, the Fidelity Bank sent another telegram to the plaintiff, announcing that Wilshire, Eckert & Co. had deposited with it, to the credit of the plaintiff, for account of Kershaw & Co., $100,000.

The Fidelity Bank, therefore, had advised the plaintiff, prior to June 15, 1887, that it had received six different deposits to the credit of the plaintiff for the use of Kershaw & Co., amounting in the aggregate to $353,000, and that four of those deposits, amounting to $250,000, had been made by Wilshire, Eckert & Co. It was the custom of the plaintiff, on receiving such certificates of deposit, to place the amount of the same to the credit of Kershaw & Co., and allow them to check against the same as deposits of money; and the four certificates were all paid by the Fidelity Bank. It was also the custom of the plaintiff to place to the credit of Kershaw & Co., as cash, any drafts which they drew on Cincinnati and deposited with it.

On the 13th of June, 1887, Wilshire was in Chicago, and promised Kershaw & Co., that he would deposit on the next day $200,000 for their use, in the Fidelity Bank. Wilshire returned to Cincinnati that night, and on June 14th Kershaw & Co., in anticipation of that deposit, left their draft for $200,000 with the plaintiff, asking the latter to find out by telegram if the deposit had been made, and if so, to forward the draft for collection. The plaintiff telegraphed to the Fidelity Bank, on June 14, as follows: "Has two hundred thousand been placed with you for C. J. K. & Co.?" The

Fidelity Bank on the same day replied: "Not yet made," and the draft was not sent forward. In consequence of this promise of Wilshire, and the previous course of dealing between the two banks, the plaintiff was prepared to receive, on the morning of June 15, as hereafter mentioned, the certificate of deposit for $200,000.

The state of the account of Kershaw & Co. with the plaintiff, on the morning of June 14, 1887, was this: They owed the plaintiff $380,378.37 overdraft and $280,000 in notes; against which the plaintiff held as collateral security 692,688 bushels of wheat, 5000 bushels of corn, and certain wheat then being loaded for shipment. The total value of such collateral, on the morning of that day, was $736,000, and the total indebtedness of Kershaw & Co. to the plaintiff was $660,378.37. During that day there was a panic in wheat, and the price fell from 92 cents to 74¾ cents a bushel. The security of the plaintiff fell in value at a corresponding rate, and at 1 o'clock in the afternoon was worth only $544,894. Kershaw & Co. then owed the plaintiff $525,477.01, namely, $280,000 in notes and $245,477.01 overdraft. Thereupon the plaintiff stopped paying the checks of Kershaw & Co., the amount of the checks refused being about $60,000.

The state of the account between the Fidelity Bank and the plaintiff on the 14th of June, 1887, was as follows: The former owed the latter a balance of something over $100,000, consisting in part of a draft drawn on the former by Wilshire, Eckert & Co., to the order of Kershaw & Co., on the 13th of June, and deposited by Kershaw & Co. with the plaintiff on that day. The plaintiff, in accordance with its custom, had treated such draft as a cash item, and had paid the checks of Kershaw & Co. against it, on the 14th. On the night of the 13th, that draft had been sent by the plaintiff to the Fidelity Bank for payment, and on the 14th the latter telegraphed the plaintiff that it was paid. Payment was made by placing the amount to the credit of the plaintiff on the books of the Fidelity Bank. On the same day (June 14) the plaintiff telegraphed to the Fidelity Bank, "remit at once hundred thousand, clearing-house currency or gold;" in re-

sponse to which it received, on the morning of the 15th, $50,000 in currency by express, and a draft for $50,000, drawn by the Fidelity Bank on the Chemical National Bank of New York, which was duly paid by the drawee. At the close of business on the 14th of June, the plaintiff had security enough to make itself whole as respected Kershaw & Co., and it had called upon the Fidelity Bank for substantially the whole balance of account due from that bank, and the same had been sent on. The plaintiff had, therefore, no inducement to take any unusual risk, in regard to the transactions now to be stated.

Just after the plaintiff had closed its bank for business on the 14th of June, it received the following telegram:

"CINCINNATI, O., 6/14, 1887.

"*Am. Ex. Nat. Bank:*

"Joseph Wilshire will be at your bank to-morrow morning with six hundred thousand dollars to make his trade with Kershaw and others good if they are protected until he arrives.
"FIDELITY NAT. BANK."

The cashier of the plaintiff sent for Kershaw & Co., showed them this telegram, and told them that, while the plaintiff wanted to do everything in its power to assist them, it could not agree to protect them in any manner. Kershaw & Co. replied in substance that if Wilshire came from Cincinnati that night, he would arrive about 8 o'clock the next morning, and that they needed no protection for the time before his arrival. Kershaw & Co. then suggested and dictated the following telegram, which was sent by the cashier of the plaintiff:

"CHICAGO, 14 June, 1887.

"*Fidelity National Bank, Cincinnati, Ohio:*

"If Wilshire is here to-morrow morning with six hundred thousand currency the deal will be safe. Answer quick.
"AM. EXCH. NAT. BANK."

The same night, two telegrams were received by the plaintiff, which read as follows:

> " CINCINNATI, Ohio, June 14, 1887.
> " *American Exchange Natl. Bank:*
> " Wilshire will be there on the morning train.
>> " FIDELITY NATL. BANK."

> " CINCINNATI, Ohio, 6/14, 1887.
> " *American Exchange National Bank, Chicago:*
> " Have already wired you that he will be there with six hundred thousand in the morning.
>> " FIDELITY NAT. BANK."

Kershaw & Co. were also advised by telegram from Cincinnati the same afternoon that $600,000 would be sent to Chicago that night.

Wilshire arrived in Chicago on the morning of June 15, and went to the plaintiff's bank, where he had an interview with Kershaw, Dewar and Eggleston, all the members of the firm of Kershaw & Co. Kershaw and Dewar figured up how much money they needed, and estimated that they needed $68,000 to settle up trades through the clearing-house of the board of trade, $90,000 to deposit for additional margins, and $60,000 to make good the checks which the plaintiff had refused to pay the day before, making a total of $218,000. The cashier of the plaintiff took down those figures at the time. Wilshire went out and shortly afterwards returned with an envelope from which he took four drafts, (one of which was the draft in suit in No. 1110,) and the certificate of deposit in suit in No. 1111. Each of the four drafts was for the sum of $100,000, dated June 14, 1887, and drawn by the Fidelity Bank on the Chemical National Bank of New York. One was payable to the order of Wilshire, Eckert & Co., one to the order of J. W. Wilshire, (not sued on,) one to the order of C. J. Kershaw & Co., and the other (in suit in No. 1110) to the order of the plaintiff. The four drafts and the certificate of deposit made up the sum of $600,000.

The two instruments involved in suits Nos. 1110 and 1111 were taken by Wilshire from the envelope and delivered by him to Kershaw & Co. The plaintiff took them on deposit from Kershaw & Co., and placed the amounts of them to the credit of the latter, in accordance with the usual course of business, together with another of the drafts, for the sum of $100,000. Kershaw & Co. thus received $400,000 of the paper, Irwin, Green & Co. receiving the remainder, $200,000. The evidence shows that the two drafts and the certificate of deposit were taken by the cashier of the plaintiff on its behalf, and placed to the credit of Kershaw & Co. by the plaintiff, without any agreement or arrangement on the part of the plaintiff, except to credit them to Kershaw & Co. as cash.

Before the plaintiff received this $400,000, the account of Kershaw & Co. with it was overdrawn $245,477.01, as before stated. On receiving the deposit the plaintiff placed to the credit of Kershaw & Co., as cash, in a single item, $399,200, the full amount of the deposit less $800 charged for exchange. This was according to the usual course of business between the plaintiff and Kershaw & Co., and according to the understanding of the parties at the time. This deposit cancelled the overdraft of $245,477.01, and left a balance to the credit of Kershaw & Co., on the morning of June 15, of $153,722.99. As soon as the plaintiff opened its bank on that day there was a run upon the account of Kershaw & Co., and before 11 o'clock in the morning the plaintiff had paid or certified their checks to the amount of $239,930.78. Meanwhile the plaintiff received on deposit $25,249.40, but this was a draft drawn against a shipment of wheat which the plaintiff had held as collateral security, and the plaintiff's condition was not bettered thereby. The plaintiff, therefore, in reliance upon such deposit of $399,200, not only cancelled Kershaw & Co.'s overdraft of $245,477.01, but also gave them $239,930.78 of fresh money, making a total of $485,407.79. By crediting the paper as cash, and using it to cancel the overdraft, the plaintiff also waived its right to sell for that purpose the grain which it held as collateral security. The result was that when the plaintiff did sell the grain, after the

paper of the Fidelity Bank was dishonored, it realized only $449,194.88 for the same grain which, when the plaintiff stopped paying Kershaw & Co.'s checks on June 14, was worth $544,894, being a shrinkage of $95,699.12.

When the plaintiff had paid Kershaw & Co.'s checks to the amount of $239,930.78, their account was overdrawn $60,958.39; and when it was found by Kershaw & Co. that it would take $200,000 (instead of $68,000) to pay their differences in the board of trade clearing-house, the plaintiff refused to certify their checks for $200,000, and they therefore suspended payment.

The Fidelity Bank placed the amount of the certificate of deposit involved in suit No. 1111 to the credit of the plaintiff, and the latter charged the same on its books to the Fidelity Bank, as a cash deposit, and notified the Fidelity Bank that it had done so. From the 28th of April, 1887, when the Fidelity Bank sent the first certificate of deposit to the plaintiff, down to the 15th of June, 1887, the Fidelity Bank had represented that Wilshire, Eckert & Co. were depositing funds with it, which it was remitting to the plaintiff; and the telegrams of June 14, 1887, from the Fidelity Bank, held out Wilshire as the owner of the $600,000 which he was to take to Chicago to protect the trades. During the six days while the Fidelity Bank remained open after the paper in question was taken by the plaintiff, the Fidelity Bank made no complaint that the plaintiff had not acted in all the transactions in an honest manner, and in accordance with the instructions of the Fidelity Bank.

What took place between the officers of the Fidelity Bank and Wilshire, which the receiver alleges in his answer amounted to a conspiracy to embezzle the funds of that bank, was not revealed to the plaintiff until it was disclosed by the evidence taken in the suits.

In regard to No. 1110 it is contended by the receiver that the draft could not take effect until it was delivered to the plaintiff; that such delivery must have been made by the Fidelity Bank; that therefore Wilshire was acting for that bank in delivering the draft; and that, as between the Fi-

delity Bank and the plaintiff, want of consideration may be shown.

The draft in question was drawn in Ohio, upon a bank in New York, and was payable in New York. It was, therefore, a foreign bill of exchange. Where there are four parties to such a bill, namely, the drawer, the drawee, the payee, and the remitter or purchaser, the usual course of business is for the drawer to deliver it to the remitter or purchaser, and for the latter to deliver it to the payee. In such a course of dealing, the remitter does not act as the agent of the drawer, but acts for himself, and in a suit on the bill by the payee against the drawer, want of consideration cannot be shown, if the payee is a *bona fide* holder for value. *Munroe* v. *Bordier*, 8 C. B. 862; *Watson* v. *Russell*, 3 B. & S. 34; *South Boston Iron Co.* v. *Brown*, 63 Maine, 139; *Horn* v. *Fuller*, 6 N. H. 511; Daniel on Neg. Inst. § 178; 1 Parsons on Notes & Bills, 181, 199.

When Wilshire went to the plaintiff's bank, on the morning of June 15, 1887, he came duly accredited by the Fidelity Bank as the purchaser of the $600,000 of paper which he brought; and he acted as such in delivering the draft in suit No. 1110. The fact that the draft was payable to the order of the plaintiff was not inconsistent with the representation that Wilshire held it as purchaser and remitter. Wilshire received value for it from Kershaw & Co., and acted with them in getting the draft placed to their credit as cash by the plaintiff; so that the plaintiff became the holder of the draft for value. Wilshire gave to Kershaw & Co. the $400,000 on account of the indebtedness of Wilshire, Eckert & Co. to them. As Wilshire delivered the paper to Kershaw & Co. with the knowledge of the plaintiff, and with the understanding that the plaintiff was to take it and place it to the credit of Kershaw & Co., the past indebtedness of Wilshire, Eckert & Co. to Kershaw & Co. was a sufficient consideration to give to the plaintiff a good title to the paper for the use of Kershaw & Co.; and it is manifest that the inducement to Wilshire to give the paper to Kershaw & Co. was chiefly the consideration that the plaintiff would give credit at once to

Kershaw & Co. for the amount. This credit was given, and on the faith of it the plaintiff paid to Kershaw & Co. on their checks, $239,930.78. The plaintiff thus became the owner of the paper which it received on deposit. *Clark* v. *Merchants' Bank*, 2 N. Y. 380; *In re Franklin Bank*, 1 Paige, 249; *Platt* v. *Beebe*, 57 N. Y. 339; *Metropolitan Nat. Bank* v. *Loyd*, 90 N. Y. 530; *National Bank* v. *Millard*, 10 Wall. 152; *Brooks* v. *Bigelow*, 142 Mass. 6; *Bank* v. *Miller*, 77 Alabama, 168; *Ayres* v. *Farmers' Bank*, 79 Missouri, 421; *Flannery* v. *Coates*, 80 Missouri, 444; *Titus* v. *Mechanics' Bank*, 6 Vroom (19 N. J. L.) 588; *Terhune* v. *Bank*, 7. Stewart (33 N. J. Eq.) 367; *In re Carew's Estate*, 31 Beavan, 39; *Ex parte Richdale*, 19 Ch. D. 409.

We do not think that the fact that the draft was payable to the order of the plaintiff was notice to the plaintiff that Wilshire was not its purchaser or remitter; or that the manner in which the plaintiff acted after taking the draft for deposit shows that the plaintiff was not a *bona fide* holder for value.

The draft for $100,000, in suit No. 1110, and the draft for $100,000 to the order of Kershaw & Co., showed a difference in form, which was noticed by the assistant cashier of the plaintiff, who feared that the Fidelity Bank might claim subsequently that the draft payable to the order of the plaintiff was a part of the $200,000 mentioned in the certificate of deposit in suit in No. 1111. He therefore sent to the Fidelity Bank this telegram:

"CHICAGO, 15 June, 1887.

"*Fidelity National Bank, Cincinnati, Ohio.*

"Your draft on New York, number sixteen four twelve, delivered us this morning, is made payable to our order. Why was this done, and is the amount charged against us or is it intended for use of W., as he may direct? Answer quick.

"AMERICAN EXCHANGE NATIONAL BANK."

This telegram was sent, as the cashier says, "as an extra precaution;" but, without waiting for a reply to it, the plaintiff paid the checks of Kershaw & Co. until their account was not only exhausted but was overdrawn $60,958.39, when fur-

ther payment of their checks was stopped. This was two hours before any reply by telegram was received from the Fidelity Bank. When the reply came, it did not disavow the authority of Wilshire to use the draft No. 16,412 as a part of the $600,000, the reply being as follows :

"CINCINNATI, Ohio, June 15, 1887.
"*American Exchange National Bank, Chicago.*

"We want number sixteen four twelve to apply on your account, and have wired parties. Please send all drafts to us and order Cincinnati National to deliver one to-day. Party that controls special account out of city. Answer.

"FIDELITY NATIONAL BANK."

The inference to be drawn from this telegram was that draft No. 16,412 had been given to Wilshire for his use, but that since it had been issued something had occurred which made the Fidelity Bank desire to withdraw it, if it could obtain the consent of the parties in interest, to whom it had wired. The telegram from the plaintiff was sufficient to notify the Fidelity Bank that Wilshire was using draft No. 16,412 as a part of the $600,000 ; and it gave the Fidelity Bank an opportunity to "answer quick" that Wilshire had no right to use that draft in that way if such were the fact. There was nothing in the reply telegram from the Fidelity Bank, even if it had been received in time, to warn the plaintiff not to place that draft to the credit of Kershaw & Co., and nothing to discredit Wilshire's title to it. After that, and until the time when the Fidelity Bank closed its doors, it made no claim that the draft No. 16,412 was not issued in good faith as a part of the $600,000, or that the plaintiff had applied it wrongly to the credit of Kershaw & Co.

While the plaintiff was paying the checks of Kershaw & Co., the two drafts for $100,000 each and the certificate of deposit were in the hands of its assistant cashier, on the way to be entered upon its books, and while they were in his hands he made out the following deposit ticket :

"AMERICAN EXCHANGE NATIONAL BANK, CHICAGO.

"Deposited for account of C. J. Kershaw & Co., June 15, 1887. Checks and drafts on other towns and cities:

| | |
|---|---:|
| Cincinnati | 200,000 |
| " N. Y. | 100,000 |
| *Fidelity. | 100,000 |
| | 400,000 |
| | 800 |
| | 399,200 |

"* Credited subject to advice from the Fidelity Nat. that draft is for Kershaw account. We have wired for advice."

This ticket was handed to the teller with the deposit, before the note at the bottom was put upon it; but immediately afterwards the assistant cashier went back to the teller and added the note. This deposit ticket was not made out when the deposit was made.

It appears that when the deposit was taken, the cashier of the plaintiff made out a deposit ticket showing one item of $400,000 deposited by Kershaw & Co., which ticket was made out at their request when they handed the deposit to the cashier and told him to place it to their credit. That deposit ticket did not come to the hands of the assistant cashier, and he made out the above deposit ticket; but there is no evidence to show that the latter deposit ticket was ever seen or assented to by Kershaw & Co., or by Wilshire. It appears that Kershaw & Co. did not know that the plaintiff had not placed the deposit at once to their credit on its books, although they did know of the telegram which the plaintiff sent to the Fidelity Bank. The above deposit ticket was thus made out by the assistant cashier of the plaintiff, for the use of the plaintiff, and it did not change in any way the terms of the deposit as between the plaintiff and Kershaw & Co., being only a private memorandum for the guidance of the paying teller. The credit on the books of the plaintiff was not made in accordance with the terms of that ticket, the

credit being in one item, of $399,200, and unconditional, the note at the bottom of the ticket not being carried into the books of the plaintiff.

These words in the telegram of June 15 from the Fidelity Bank, " Please send all drafts to us, and order Cincinnati National to deliver one to-day.   Party that controls special account out of city," are explained thus: On the 14th of June, Irwin, Green & Co. deposited with the plaintiff a draft of theirs on the Fidelity Bank for $217,862.50, which the plaintiff sent to the Cincinnati National Bank for collection.   It was presented on the 15th of June to the Fidelity Bank, which refused to pay it, alleging that the deposit against which the draft was drawn had not been made.   Irwin, Green & Co., however, held a certificate of deposit issued by the Fidelity Bank, and their draft was drawn against that deposit.   The party, Hoyt, who controlled the special deposit was out of the city of Cincinnati, but he was in Chicago, and said that the draft was all right and ought to be paid.   The telegram from the Fidelity Bank contained also the request that the plaintiff should order the Cincinnati National Bank to turn over to the Fidelity Bank, without payment, such draft for $217,862.50, and should send directly to the Fidelity Bank all drafts upon the latter.

On the 16th of June, four telegrams passed between Wilshire and the plaintiff, which show that the plaintiff did not suspect that Wilshire had any connection with the Fidelity Bank or its officers.   The first was as follows:

" To Am. Ex. Bank :                    " CINCINNATI, Ohio, 6/16, 1887.

"After yesterday's understanding Kershaw must be protected to-day.   Should this be done, all is well, if not, fear trouble to all.                                        WILSHIRE."

The plaintiff replied as follows, under date of June 17th:

"Wilshire, Cincinnati, Ohio :          " CHICAGO, June 17, 1887.

"Do not admit any understanding, but if you will deposit three hundred thousand to the credit of this bank, with the

First National Bank, Cincinnati, and have that bank wire to their correspondents here by cipher that this has been done, and to advise us, and also have Chemical, New York, telegraph us through American Exchange National Bank that the drafts for two hundred thousand which will be presented by American Exchange National Bank for our account and use of Kershaw will be paid, we will protect Kershaw up to four hundred thousand dollars. He claims three hundred thousand will see him through."

On the 16th of June the plaintiff received the following letter from the Fidelity Bank:

"CINCINNATI, June 15, 1887.
"*American Exchange National Bank, Chicago, Illinois:*
"GENTLEMEN: We charge your account $100,000 New York exchange to your order sent you by messenger to-day.
"Respectfully yours,
"E. L. HARPER, *V. P.*"

The plaintiff thereupon sent to Wilshire the following telegram, and Wilshire replied by telegram as follows:

"*Wilshire, Cincinnati :.*                "JUNE 16, 1887.
"Fidelity advises us this morning by letter that they have charged to our account New York exchange for one hundred thousand, payable to our order and left with us by you yesterday. This must be reversed and Chemical instructed to wire us they will pay same. Also Fidelity wire us direct that they have reversed the charge, and authorize us to use this item for Kershaw. Otherwise you must deposit four hundred thousand instead of three hundred thousand in the bank we have already designated. Rush.
"AMERICAN EXCHANGE NATIONAL BANK."

"CINCINNATI, 16.
"*To American Exchange Nat'l Bank:*
"Your telegram received at eleven three. Will go to work at once and arrange matter, but you must see Kershaw through without fail. You should have wired us sooner and would have fixed you up as desired.          J. W. WILSHIRE."

The telegram dated June 17, from the plaintiff to Wilshire, shows that the plaintiff was determined to avoid trouble over draft No. 16,412, which it had credited to Kershaw & Co., but which the Fidelity Bank had charged to the plaintiff.

Wilshire left Chicago during the night of June 15, knowing the exact condition of things between Kershaw & Co. and the plaintiff. He reported to Harper at Cincinnati the next morning, and at the very time when he was sending his two telegrams of June 16 to the plaintiff, he and Harper were arranging further to defraud the plaintiff by stopping payment of the drafts which Wilshire took to Chicago. They telegraphed the Chemical National Bank not to pay them, and when the four drafts were presented it refused to pay them. Harper and Hopkins, on the 16th of June, charged draft No. 16,412 to the plaintiff on the books of the Fidelity Bank, but they entered it in the transactions of June 15, and changed the footings of the column in which the entry was made.

In reply to the suggestion that the plaintiff took the draft No. 16,412, as collateral security, and therefore was not a *bona fide* holder of it, it is to be said that the plaintiff took the deposit as a cash deposit, and that there was no agreement with Kershaw & Co. that the deposit should be held only as security; because the amount of the deposit was credited as cash on the books of the plaintiff, at or about 11 o'clock on the morning of June 15, and the plaintiff paid the checks of Kershaw & Co. on the faith of the deposit of the draft.

The conclusion of the whole matter is, that the Fidelity Bank represented to the plaintiff that Wilshire was a *bona fide* holder of draft No. 16,412, for his use in making good his trades with Kershaw & Co.; that the plaintiff, relying on such representations, took the draft on deposit from Kershaw & Co., placed it to their credit, and paid their checks; and that, under those circumstances, the Fidelity Bank was estopped from showing that Wilshire was not a *bona fide* holder of the draft, and the receiver stands in no better position than the Fidelity Bank.

The decree of the Circuit Court in No. 1110 was, therefore, right.

As to No. 1111, the paper in question was in its legal character a certificate of deposit. *Hart* v. *Life Association*, 54 Alabama, 495; *Long* v. *Straus*, 107 Indiana, 94; *Lynch* v. *Goldsmith*, 64 Georgia, 42, 50; *Howe* v. *Hartness*, 11 Ohio St. 440; *Miller* v. *Austen*, 13 How. 218.

The certificate stated that Wilshire, Eckert & Co. had deposited so much money. The Fidelity Bank telegraphed to the plaintiff that Wilshire would come with so much money. It intended that the plaintiff should take the paper as money. The plaintiff did take it as money, and the Fidelity Bank entered the paper on its books as being its own check upon itself. Wilshire went to the plaintiff on the morning of June 15 as the purchaser and controller of the certificate in like manner as he went as the purchaser and controller of draft No. 16,412. At the request of Wilshire, Eckert & Co., the Fidelity Bank issued the certificate directly to the plaintiff. What has been said before, in relation to the claim of the plaintiff as the holder of the draft No. 16,412, applies with equal force to its claim as the holder of the certificate. It was a purchaser, and an innocent purchaser, for value, of both pieces of paper. There is no question of negotiability, because the suit is brought by the original payee, and the paper was applied by the plaintiff for the use of Kershaw & Co., as directed by the certificate.

As soon as the paper was delivered to and accepted by the plaintiff, the Fidelity Bank had entered into a contract with it to pay $200,000. The suit is for the amount which the Fidelity Bank agreed to pay, and not for damage sustained by the plaintiff through the misrepresentation of that bank. The plaintiff accepted the contract in good faith, by placing $200,000 to the credit of Kershaw & Co.; and it also charged $200,000 to the Fidelity Bank, and notified that bank that it had done so. The Fidelity Bank acted on that contract, after it was notified of its acceptance by the plaintiff, by placing $200,000 to the credit of the plaintiff, and charging that amount to Wilshire, Eckert & Co. The plaintiff was not required to pay the Fidelity Bank anything upon the contract, because the Fidelity Bank represented that Wilshire, Eckert & Co. had paid for it.

The plaintiff was required, if it accepted the contract, to give the benefit of it to Kershaw & Co. It did that by at once giving Kershaw & Co. credit for $200,000, and that amount still stands on its books to the credit of Kershaw & Co. The defendant cannot escape the consequences of the contract of the Fidelity Bank by saying that the statement of that bank that it had received from Wilshire, Eckert & Co. the consideration for the contract was false, because he is estopped from setting up for his protection the falsity of that statement after the plaintiff had acted upon it. The plaintiff is seeking to recover upon a contract, and the receiver is defending by setting up the false representation of the Fidelity Bank.

The suggestion is not a sound one that the plaintiff took the paper under such circumstances as would put a man of ordinary prudence upon inquiry. The Fidelity Bank, prior to June 14, 1887, had notified the plaintiff of four deposits made with the former by Wilshire's firm, for the use of Kershaw & Co., in April and May, 1887, amounting together to $250,000. For each of those deposits the Fidelity Bank had issued paper similar to that in suit in No. 1111. The amounts were placed to the credit of Kershaw & Co. by the plaintiff, and were paid by the Fidelity Bank to the plaintiff in the due course of business. Nothing passed between the two banks to indicate that the Fidelity Bank knew what Wilshire's firm was doing with the money, until the telegram of June 14, from the Fidelity Bank to the plaintiff, was received by the latter. The plaintiff was banker for Kershaw & Co., and had that day stopped payment of their checks. Kershaw & Co. were the brokers of Wilshire's firm, and had bought a large quantity of wheat for them for future delivery, which needed immediate protection by the deposit of margins. The Fidelity Bank was the banker in Cincinnati of Wilshire's firm, and the two banks were regular correspondents. It was natural for Wilshire to ask his bank to send the telegram to Kershaw & Co.'s bank, and there was nothing in that to put a prudent institution upon inquiry. It was natural that the cashier of the plaintiff should understand that the two banks were carrying on the telegraphic correspondence solely for the benefit of their respective customers; and the

plaintiff was led to expect that Wilshire would arrive the next morning with $600,000 of his own money, to use in making good his trades with Kershaw and others. There was nothing in the telegram to lead the plaintiff to understand that Wilshire would be in Chicago with $600,000 of the money of the Fidelity Bank, to make good trades of his for that bank. The appearance of Wilshire the next morning with $600,000 would naturally lead the plaintiff to believe that it was his own money, and the same money spoken of in the telegram of the day before from the Fidelity Bank.

There was nothing in the paper brought by Wilshire to lead the plaintiff to suspect that the money was the money of the Fidelity Bank. The paper was all in proper form to be controlled by Wilshire, and to be used by him to protect his trades with Kershaw and others. The cashier of the plaintiff had suggested by telegram to the Fidelity Bank, on the 14th of June, that Wilshire should bring currency. As he brought paper, which, if the plaintiff took it, must be treated as money, and as the plaintiff had another draft on the Fidelity Bank for $217,862.50, deposited by Irwin, Green & Co., which was then in Cincinnati for collection, the cashier of the plaintiff, before finally taking the paper, asked Wilshire if the Fidelity Bank was solvent. This indicated no suspicion of the true state of facts, as they were subsequently disclosed, and the question was a natural one to be put to a person who was having large money transactions with the Fidelity Bank, and who had just endorsed its two drafts for $100,000 each. The attorney of the plaintiff was at the bank, and before its cashier took the paper he told the attorney what Wilshire had said, and that everything appeared perfectly straight. He would not have taken the paper and paid out nearly $240,000 on the faith of it if he had suspected that it was otherwise than the *bona fide* paper of the Fidelity Bank, issued for a like amount of money received by that bank.

When the plaintiff learned that the Fidelity Bank had refused to pay the Irwin, Green & Co. draft for $217,862.50, and when it had received the telegram of the Fidelity Bank asking that that draft be turned over to it without payment,

it lost confidence in the solvency of the Fidelity Bank; buu it still believed Wilshire to be the true principal, and telegraphed him to put his money in another bank. Wilshire replied by telegram, on June 16: "Will go to work at once and arrange matter; but you must see Kershaw through without fail. You should have wired us sooner, and would have fixed you up as desired," thus keeping up the deception.

The rumors on the board of trade and in the public press that Harper was the real principal for whom Wilshire was acting, cannot affect the plaintiff. There is no evidence that any officer of the plaintiff ever heard any rumor connecting Harper's name with the purchases of grain. Even if the plaintiff had learned as a fact that Harper was buying wheat through Wilshire, that would not have been notice that the statement in the certificate of deposit, that Wilshire, Eckert & Co. had deposited $200,000, was false; nor would it have been notice that Harper was using the funds of the Fidelity Bank. The drafts and the certificate of deposit were all of them signed by Hopkins, the assistant cashier of the Fidelity Bank. Nothing occurred to make the plaintiff suspicious of the *bona fide* character of the paper; and Wilshire, by delivering the paper, affirmed the statement of the Fidelity Bank that his firm had deposited $200,000 to the credit of the plaintiff. Wilshire was concerned in concealing the truth. He had come for the express purpose of deceiving the plaintiff; and the latter cannot be charged with negligence in not asking for information from him. There is no evidence tending to show that the plaintiff had any suspicion that Harper, Hopkins and Wilshire had conspired together to embezzle the funds of the Fidelity Bank, or that the paper was signed by Hopkins, and delivered by Harper to Wilshire, to be used in purchasing wheat. The success of the conspiracy depended on the concealment of the fact that Wilshire, Eckert & Co. were not depositing with the Fidelity Bank the amounts for which it was issuing its paper. There was authority to issue the paper, if Wilshire, Eckert & Co. made the deposit; and the consequence of the fraud must fall upon the Fidelity Bank, and not upon the plaintiff.

As to the suggestion that the plaintiff was not warranted in giving an immediate credit of $200,000 to Kershaw & Co. on the faith of the certificate of deposit, it is to be said that so far as the face of the paper is concerned it was left to the option of the plaintiff either to give Kershaw & Co. the immediate use of the money, or to await the collection of the money on the certificate. It is apparent that the Fidelity Bank, in issuing the paper, intended that the plaintiff should use it as money, and the emergency upon Kershaw & Co. required such use of it.

In reply to the claim on the part of the receiver that if the plaintiff can recover at all it can recover only the money which it paid out in reliance on the certificate, it is to be said that that instrument is a contract by the Fidelity Bank offering to the plaintiff to become its debtor in the sum of $200,000, and asking it to become a creditor of the Fidelity Bank, for the benefit of Kershaw & Co., the object being to convert a credit in Cincinnati, for which Wilshire, Eckert & Co. had paid, into a credit in Chicago with the plaintiff, as the banker of Kershaw & Co., for the use of that firm. The plaintiff accepted this offered contract, assumed the relation of creditor to the Fidelity Bank, for the use of Kershaw & Co., and at once gave them credit for $200,000, thus fully complying with the contract. When the plaintiff placed $400,000 to the credit of Kershaw & Co., it paid them that amount; and the legal effect of the transaction was the same as if the plaintiff had given $400,000 in currency to Kershaw & Co., and they had deposited it to their credit in some other bank.

The plaintiff held Kershaw & Co.'s check for $256,878.18, which it was carrying. The check was regular and the plaintiff had a right to have it paid at once. It had not been charged up, for there was only $11,401.17 in Kershaw & Co.'s account against which to charge it; but in stating the overdraft on the evening of June 14, we have treated it as if it had been debited. That check was paid by the plaintiff and charged to Kershaw & Co., on the morning of June 15, in reliance upon the deposit of the Fidelity Bank paper for $400,000. The plaintiff had the right to apply the deposit of Kershaw & Co.

to the payment of their indebtedness to it which was due. It was the understanding of Kershaw & Co. that all of their outstanding checks should be paid from the deposit. In addition to cancelling the check for $256,878.18, the plaintiff paid out $239,930.78 on June 15. It therefore paid out during that day $496,808.96. It received on deposit $399,200 in Fidelity Bank paper, and $25,249.40 in a draft drawn against a shipment of wheat, and there was a credit upon its books of $11,-401.17 at the beginning of business on that day. The debit side of the account was therefore $496,808.96, and the credit $435,850.57, being an excess of debit of $60,958.39.

The plaintiff also forbore to sell the grain which it held as collateral security for Kershaw & Co.'s indebtedness, and which was worth on June 14, at the lowest market price of that day, $544,894. After payment of the Fidelity Bank paper was refused, the plaintiff sold the grain for $449,194, a shrinkage of $95,700. There was no agreement that the plaintiff should hold the grain, but the deposit of $400,000 made it unnecessary to sell it, and good faith toward Kershaw & Co., under the circumstances, required that that should not be done. The plaintiff, therefore, in reliance upon the paper of the Fidelity Bank, paid the check of Kershaw & Co. for $256,-878.18, gave them $239,930.78 of further money, and suffered a loss of $95,700 on the collateral security which it held.

We do not think that the matter of the application of the proceeds of the collateral security has anything to do with either of the cases.

As Kershaw & Co. deposited, and the plaintiff credited, the three pieces of Fidelity Bank paper as a single cash item, whatever the plaintiff did on the faith of the deposit of $400,-000 was done on the faith of each piece of paper which went to make up that deposit. When the plaintiff accepted the certificate of deposit, it was at liberty to use the credit for $200,000 in any manner which it and Kershaw & Co. might agree upon, the only requirement made by the Fidelity Bank being that the credit should be applied to the use of Kershaw & Co. It was applied to such use as much by paying their indebtedness to the plaintiff as by paying what they owed to

any other party. As the plaintiff is seeking to recover on a contract with which it has fully complied on its part, the receiver must fully comply with the other part of it; and if Wilshire, Eckert & Co. did not put $200,000 in the Fidelity Bank to the credit of the plaintiff, as that bank declared they had done, the receiver must make good the representation by placing a like amount to the credit of the plaintiff.

As to the defence that Harper, Hopkins and Wilshire, with other persons, on and before June 14, 1887, were engaged in purchasing wheat on contracts for future delivery, and otherwise, with the object of creating a "corner" in the market; that at the time of the delivery of the paper to the plaintiff it had notice that they were engaged in such speculation; and that the certificate of deposit was delivered to Wilshire and by him to the plaintiff to be used, through the plaintiff and by Kershaw & Co., who were, and were well known to the plaintiff to be, brokers engaged in the purchase of wheat, in such speculation, for the account of Wilshire and his confederates; the defence amounts to this, that if the plaintiff received money from the Fidelity Bank to be transferred to Kershaw & Co., it could refuse to pay over the money to the latter if it knew that they intended to use the money to pay a gambling debt which the Fidelity Bank had contracted.

When the plaintiff received the deposit from Kershaw & Co., it was bound to honor their checks against it; and it could not refuse to pay them on the ground that Kershaw & Co. intended to make an improper use of the money. If Wilshire, Eckert & Co. and Kershaw & Co. were engaged in gambling, and the former had deposited money in the Fidelity Bank to be transferred to the plaintiff, in order that Kershaw & Co. might check out the amount from the plaintiff's bank in payment of losses sustained in the gambling transactions, and both banks knew that the money was to be so used, still the Fidelity Bank, having received the deposit, could not refuse to pay it over to the plaintiff, and the plaintiff, having received it, could not refuse to honor the checks of Kershaw & Co., drawn against it. *Tenant* v. *Elliott*, 1 B. & P. 3; *Farmer* v. *Russell*, 1 B. & P. 296; *Sharp* v. *Taylor*, 2 Phillips (Ch.) 801; *Arm-*

*strong* v. *Toler*, 11 Wheat. 258; *Kinsman* v. *Parkhurst*, 18 How. 289; *Brooks* v. *Martin*, 2 Wall. 70; *Planters' Bank* v. *Union Bank*, 16 Wall. 483; *McMicken* v. *Perin*, 18 How. 507.

Nor do we think that the statute of Illinois, 1 Starr & Curtis, Stat. 1885, pp. 791, 792, sections 130, 131, or the case of *Pearce* v. *Foote*, 113 Illinois, 228, has any application to the present case. That statute makes it an offence to "corner" the market, or to attempt to do so, and makes void all contracts to reimburse or pay any money or property knowingly lent or advanced at the time and place of any play or bet, to any person gambling or betting. The two banks were not attempting to corner the market in wheat. Whether Wilshire and his confederates were engaged in attempting to do so, and had made purchases for that purpose through Kershaw & Co. as brokers, is another question. This is not a suit by Kershaw & Co. against Wilshire or his firm, or against the Fidelity Bank. It is a suit on a contract made by the Fidelity Bank with the plaintiff; and the receiver cannot defend it on the ground that the plaintiff knew that if it paid over the money to Kershaw & Co., as the Fidelity Bank requested, the money would be used in an illegal transaction.

In *Pearce* v. *Foote, supra,* Foote made an express agreement with certain commission men to trade exclusively in differences in options, declaring that he did not want to buy any provisions, but simply to speculate and settle on differences. He lost a large sum in such transactions, and endorsed over to the commission men certain notes. The court held that such options were gambling contracts, and that, as the statute of Illinois provided that any person who should lose in a gambling transaction might recover back from the winner whatever he should pay on account of such loss, Foote could recover the value of the notes from the commission men. But the plaintiff is not the winner in any gambling transaction. The purport of the decision in *Pearce* v. *Foote* is that, as the commission men participated in the illegal transaction, they could not take the ground that their interest was only that of a commission. The plaintiff is not in the situation of the commission men, and the receiver is not in the situation of Foote.

The cases which have been decided in regard to the statute of Illinois arose between brokers and principals, or between winner and loser, and do not apply to the case at bar.

It is contended, however, by the receiver that the money advanced by the plaintiff to Kershaw & Co., on the 15th of June, was advanced knowingly at the time in the course of an attempt to corner the market and to aid Kershaw & Co. in doing so. The statute of Illinois makes void any contract "for the reimbursing or paying any money or property knowingly lent or advanced at the time and place of such play or bet to any person or persons so gaming or betting." This is not a suit against Kershaw & Co. to recover money lent to them; nor is it true that the plaintiff advanced money to them to assist them in attempting to corner the market. It is not averred in the answer, nor proved, that Kershaw & Co. were engaged in such an attempt. The averment of the answer is that Harper, Hopkins, Wilshire, and other persons to the defendant unknown, were engaged in such an attempt, and that Kershaw & Co. were acting as brokers; but it is not averred that the brokers had any knowledge of the object of their principals, and the evidence shows that they had no such knowledge. The money which the plaintiff advanced to Kershaw & Co., on the 15th of June, was not lent to them on an agreement by them to repay it; but it was advanced to them in consideration of the deposit with the plaintiff of the $400,000 of Fidelity Bank paper. Nor is there any proof that any of the money paid by the plaintiff to Kershaw & Co., on the 15th of June, was paid out for wheat purchased for Wilshire, Eckert & Co. The burden was on the receiver to show clearly that the money paid out was upon illegal transactions. He fails to do so; and much more does he fail to show that the money was paid for present purchases; that is, in the language of the statute, that it was advanced "at the time and place" of the purchases, and not to pay debts incurred in the making of past purchases. If it were shown that the plaintiff advanced money to Kershaw & Co., on the 15th of June, to be used in paying for wheat which Kershaw & Co. had purchased at some time in the past, in an attempt

to corner the market, it would not follow that the plaintiff could not collect from them such advances.

Where losses have been made in an illegal transaction a person who lends money to the loser with which to pay the debt can recover the loan, notwithstanding his knowledge of the fact that the money was to be so used. *Armstrong* v. *Toler*, 11 Wheat. 258; *Kimbro* v. *Bullitt*, 22 How. 256, 269; *Planters' Bank* v. *Union Bank*, 16 Wall. 500; *Tyler* v. *Carlisle*, 79 Maine, 210; *McGavock* v. *Puryear*, 6 Coldwell, 34; *Waugh* v. *Beck*, 114 Penn. St. 422.

It is not shown, as is claimed by the receiver, that in advancing the money to Kershaw & Co. the plaintiff became a participator in an illegal attempt to corner the market, or that it had aided in such an attempt by previously advancing money to them upon a part of the wheat as collateral security. Although the plaintiff had advanced money from time to time to them upon wheat as collateral security, there is no evidence that it knew, or had any reason to suspect, that the wheat was purchased in an attempt to corner the market.

An obligation will be enforced, though indirectly connected with an illegal transaction, if it is supported by an independent consideration, so that the plaintiff does not require the aid of the illegal transaction to make out his case. *Armstrong* v. *Toler*, 11 Wheat. 258; *Faikney* v. *Reynous*, 4 Burrow, 2069; *Petrie* v. *Hannay*, 3 T. R. 418; *Farmer* v. *Russell*, 1 B. & P. 296; *Planters' Bank* v. *Union Bank*, 16 Wall. 483; *McBlair* v. *Gibbes*, 17 How. 232, 236; *Brooks* v. *Martin*, 2 Wall. 70; *Bly* v. *Second Nat. Bank*, 79 Penn. St. 453.

Although the contract between the two banks was made in the State of Illinois, it was to be performed in the State of Ohio; and, the receiver being estopped from saying that Wilshire, Eckert & Co. did not deposit the $200,000 in the Fidelity Bank to the credit of the plaintiff, it is the law of Ohio (*Ehrman* v. *Insurance Co.*, 35 Ohio St. 324) that he cannot be heard to say that the plaintiff acquired the certificate of deposit in connection with an illegal transaction.

The result, however, of the evidence is that it does not appear, as alleged in the answer of the receiver, that the

plaintiff had knowledge or notice that the paper in suit was delivered to it to be used through it by Kershaw & Co. in connection with an attempt to corner the market. A detailed discussion of the evidence would not be profitable.

We think, therefore, that the Circuit Court was right in making a decree against the receiver in No. 1111.

In both of the cases it is claimed that the court erred in adjudging that the plaintiff was entitled to interest on the 25 per cent dividend on its claim, from October 31, 1887, until the time the dividend should be paid. As authority the receiver cites the case of *White* v. *Knox*, 111 U. S. 784. But we do not think it applies. In that case a judgment was obtained for a claim by White, in June, 1883, which included interest on his claim to that time. While the claim was in litigation, the receiver had paid ratable dividends of 65 per cent to other creditors. After the judgment in favor of White, the Comptroller of the Currency calculated the amount due him as of December 20, 1875, the time when the bank failed, and paid him 65 per cent on that amount. He contended that the dividend should be calculated on his claim with interest to the time of the judgment; but this court sustained the action of the Comptroller. In the present case, the claims of the plaintiff, as allowed, do not include interest beyond the date when the bank failed. Interest upon the dividend which it ought to have received on the 31st of October, 1887, is a different matter. The allowance of that interest is necessary to put the plaintiff on an equality with the other creditors. That point was not decided in *White* v. *Knox;* and we think the Circuit Court did not err in allowing such interest.

It results that the decrees in both cases must be

*Affirmed.*

Mr. Chief Justice Fuller did not take any part in the decision of this case.