ALCAIDE, PLAINTIFF AND APPELLANT, v. MORALES, DEFENDANT AND APPELLEE.

APPEAL from the District Court of Guayama in an Action for Annulment of Acknowledgment of Paternity and Denial of Support.

No. 1883.—Decided April 8, 1920.

NATURAL CHILD — ACKNOWLEDGMENT — ESTOPPEL — LIMITATION.—A person has a right to sue for the annulment of the acknowledgment of a supposed natural child when the acknowledgment was the result of error, deceit, intimidation, force, or other similar cause, and neither the rule of "estoppel in pais" or that of "estoppel by laches" prevents the exercise of such right, but it is barred by limitation after fifteen years. The evidence in such a case must be sufficiently strong to fully convince the court that an annulment of the acknowledgment is the only action demanded by justice.

ID.—APPEAL—NEW TRIAL.—The circumstances of this case convinced the Supreme Court that the ends of justice required a new trial.

The facts are stated in the opinion.

Messrs. Alvarez Nava & Dominguez and F. Soto Gras for the appellant.

Messrs. M. Benítez Flores and A. R. Barceló for the appellee.

MR. JUSTICE DEL TORO delivered the opinion of the court.

This is an action for the annulment of the acknowledgment of a natural child made by the father who brings the action. Simón Antonio Alcaide, by his attorneys, filed a complaint in the District Court of Guayama against the minor María de los Dolores Morales, known as María de los Dolores Alcaide, and against María Morales, the mother of the minor, alleging that on October 3, 1900, mistakenly believing that María de los Dolores was his natural daughter as the offspring of his amorous relations with María Morales, the plaintiff attempted to acknowledge her by means of a marginal note on the record of the birth of the said María

de los Dolores in the Civil Register of Guayama; that the natural mother of the child did not witness nor consent to the supposed acknowledgment; that the acknowledgment was not made in a will, nor by a judgment, nor in any other written form, and the note was entered upon the mere statement of the plaintiff; that he made the acknowledgment because María Morales, maliciously and knowing it to be false, led him to believe that María de los Dolores was his daughter when the fact is that she is the daughter of another person; that immediately upon learning the truth, or in the middle of the year 1914, he sought the annulment of the acknowledgment and since then he has been constantly endeavoring to secure its annulment; that except the said note there is no written acknowledgment by him of María de los Dolores as his daughter and although it is true that he performed other acts of acknowledgment, he always acted under the error and fraud referred to; that María de los Dolores never enjoyed the continuous possession of the status of his acknowledged natural daughter; that by virtue of certain proceedings brought in the name of the minor he was ordered by a judgment of March 9, 1916, to pay an allowance for her support, and on the 20th of April of the same year he deposited under protest with the clerk of the court the amount so claimed; that maliciously prompted by María Morales, the minor pretends to be the acknowledged natural daughter of the plaintiff, uses his name and aspires to inherit the estate that the plaintiff may leave at his death.

The complaint was filed on April 20, 1916, and concludes with the prayer that the court enter judgment holding that María de los Dolores Morales, known as María de los Dolores Alcaide, is not a natural daughter of the plaintiff; that the marginal note appearing in the civil register does not constitute an acknowledgment and is null and void and should be canceled; that María de los Dolores Morales has no right to use the name of the plaintiff, nor to demand anything from

him for her support, nor to inherit any portion of the estate of the plaintiff at his death, and that the defendants should pay the costs and return to him the amounts already received for support.

Defendant María de los Dolores Alcaide answered, setting up as a first defense that the plaintiff voluntarily acknowledged her (describing the manner in which he did so) and is now estopped from repudiating his own solemn and irrevocable act; as a second defense, that the action is barred by limitation, and as a third defense she answered all of the averments of the complaint. In brief, the defendant maintains that Alcaide acted voluntarily and not upon the fraudulent representations of María Morales; that he was fully conscious of what he was doing; that her acknowledgment also appears from letters written by Alcaide to María Morales; that the purpose of the action brought by Alcaide on June 1st, 1914, was to enter into a conspiracy with María Morales and obtain a judgment in his favor by the acquiescence of the defendant, and when the defendant opposed the action the plaintiff abandoned it; that she never acted nor was prompted to act fraudulently, and that what she has done and intends to do in the future is in the exercise of a right. María de los Dolores also filed a counter-complaint praying for judgment declaring her to be the acknowledged natural daughter of Simón Alcaide.

The other defendant, María Morales, also filed an answer similar to the answer of her daughter.

The issue being thus joined, the case was brought to trial. The plaintiff began by introducing in evidence a copy of the birth certificate of María de los Dolores. The marginal note reads as follows:

"On October 3, 1900, at 10 a. m., before José García Salinas appeared Simón A. Alcaide y Báiz, a native of this town, thirty-five years old, unmarried, property owner and domiciled on Morse Street, and stated: That he acknowledges the girl registered in the present

entry, María de los Dolores, as his natural daughter, in conformity with section 131 of the Civil Code; that her paternal grandparents are Antonio J. Alcaide and Estela Báiz, the former a native of Andalucía and the latter of Arroyo, both now deceased. All of which he stated before witnesses Eugenio Cruz Manatou and Nazario Antonetti, of age, residents of this town, unmarried, and employees, who sign with the principal below the signature of the judge.—Attest.—García Salinas.—S. A. Alcaide.—E. C. Manatou.—Nazario Antonetti.—José Aponte."

Then the plaintiff testified. He admitted that he had amorous relations with María Morales from 1894 to 1900, supporting her and having continued sexual intercourse with her, María de los Dolores having been born in 1897. He said that during the time of such relations he was frequently absent and sometimes for long periods; that "he loved María, was very fond of her and trusted her, and during that time she gave him no ground for suspicion;" that "the belief of the witness with regard to the paternity of María de los Dolores at the time of her birth was that she was his daughter and he remained in that belief until about the year 1900 when she was acknowledged;" that "when María Morales went to register the birth of her daughter Dolores she neither asked or invited him to acknowledge her; that after the certificate of birth was entered María Morales began to ask him to acknowledge the girl, saying that she was going to have no father, nor protection, and insisted that he acknowledge her;" that "after the year 1900, when the acknowledgment was made, rumors spread that the girl was not his daughter, that she had deceived him, that she was unfaithful to him, that the conduct of María Morales was apparently good, that he did not continue the amorous relations after 1900;" that "he married in 1901." Alcaide testified that through public rumor and by his friends he obtained the knowledge that the girl was not his daughter; that his wife bore him no children; that he became convinced that María de los Dolores was not his daughter in the year 1904 by reason of

what was said to him by Doctor Jesús M. Amadeo when he asked the doctor why his wife had borne him no children. He spoke of the attack of orchitis which he suffered in 1893, giving full details. Upon being questioned with regard to a certain contradiction noticeable between his present testimony and what he had alleged in the complaint, he replied: "As I have already said in 1905 I knew of this and I continued to consider the matter until 1914 when I brought the action." The witness acknowledged that "after obtaining the information of which he spoke and after having the opinion of Doctor Amadeo he did not change his conduct towards the girl, but continued to give her the same monthly sum and put her in two houses, paying her monthly expenses." The witness made other statements to the effect that until 1912 he was not fully convinced that María de los Dolores was not his daughter.

Then Arturo Menar testified that his brother Francisco used to visit María Morales about the year 1895; that "he spoke to me about the child and Pancho Menar considered her his daughter, saying that although Alcaide acknowledged her as his daughter she was not, but was his (Pancho's) daughter." On this point Ramón R. Valencia testified as follows: "Referring to Pancho Menar, I used to see him in the house of María Morales when Alcaide was in Maunabo and he visited the house of María Morales day and night." Emilio Calimano said "that he used to talk with Pancho Menar when he was idle and he told the witness that he had amorous relations with María Morales, who was at the time the mistress of Simón Alcaide; that sometimes he was sorry for Alcaide, seeing how blind he was regarding the girl, who while his mistress had amorous relations with another man, and witness pitied him much more after he acknowledged the child which he believed to be his daughter, but which Menar was convinced was his daughter." José N. Nieves testified that "he had occasion to talk with Pancho

Menar about the paternity of María Dolores, the daughter of María Morales, because Pancho was somewhat indiscreet and he spoke about it openly. Menar said that he considered her as his daughter and frequently said that "he had carnal relations with María Morales." José Llorens Delgado testified that "Pancho Menar told him on several occasions while conversing about the paternity of María de los Dolores, the daughter of María Morales, that the girl was his daughter." At the time of the trial of the case Francisco Menar was dead. The testimony recited in this paragraph was admitted over the objection of the defendants.

Doctor Amadeo testified that he treated Alcaide in 1893 for double orchitis which left him impotent, and Angel M. Pesquera testified that in 1917 he made a microscopic examination of the semen of the plaintiff and the analysis showed "a total absence of spermatozoa."

Lastly, the plaintiff offered in evidence a copy of a complaint filed in Guayama in 1915 by María Morales in an action on behalf of her minor daughter, María de los Dolores, praying for a decree that Alcaide was not the father of the minor, and evidence regarding the resemblance between the father and the girl. It is not shown that the photograph apparently referred to at the trial was actually made. At least none came up with the transcript.

The plaintiff having rested, the defendants, proceeded to examine their evidence. María Morales testified and admitted her relations with Alcaide for a period of about eight years, saying that as a result of their relations María de los Dolores was born. She denied having had sexual intercourse with Menar or having persuaded Alcaide to acknowledge the girl as his daughter. In connection with this point she said: "I had no knowledge of the acknowledgment until he brought the certificate to me. I do not remember the date, but it was after his last voyage to the United States before his marriage. When he had already prepared for his mar-

riage he brought me the acknowledgment of the girl. In the afternoon of the day on which he brought it I asked him: 'Why did you not come last night?' and he answered: 'Because I was busy.' I said to him: 'I know that you are going to marry,' for he had denied it, 'and now you come here.' And he replied: 'Yes, I am going to marry,' and I said to him: 'And my poor child will be alone.' He said: 'No, I will always take care of your child; I will never abandon you; here you have her acknowledgment and that shows you how I love my daughter.' "

While she was testifying there were introduced in evidence two letters from Alcaide to the witness, as follows:

"Maunabo, May 7/98.—My dear María.—Yesterday I replied to your letter of the 6th and have no doubt that I will receive one today.—I am glad that you and Lolita are all right.—I am well, but feeling lonesome and desirous of being with you.—I am expecting the steamer in the morning (Sunday) and have no doubt that I will be able to finish my work early on Thursday. I am sending you a note for Juan Alsieux, which you may send by Fernando or José and he will send you money for the daily expenses, or you may give it to him when he passes by.—From now on it is necessary to put five-cent stamps on letters instead of three-cent stamps as formerly, therefor I am sending you some.—I end this letter here for I must go to the port to see how things are going.—How is my Lolita? I am very anxious to see her. Is she growing? Give my Lolita many kisses and accept many for yourself from your loving (signed) Simón.—My regards to the neighbors.—I expect the sweet potatoes will arrive in good condition. I will try to get some yautías this afternoon."

"Arroyo, P. R., October 15, 1898.—Dear María. Yesterday morning I was surprised to find in your house a letter addressed to me and to know that you had started for Maunabo. Your letter is full of insults to me while I think I have done you nothing but good. I did not believe that after living together for five years you would pay me in this way. Perhaps I must pay for some sins which I have committed. You have deprived me of seeing my little angel again. Alright, I deserve all this.—Your house is as you left it if you should desire to return, and the few pieces of furniture that I could give

you are at your disposal, if you want them to be sent to you; not, as you say, that you leave them so that I may put another woman in your place. A woman should be sensible and not act rashly as you have done.—What will the people say of all this? I know you will tell me that you don't care; that it is because you love me very much. I again tell you that your house is here and I am willing to receive you, for I consider that I have done you no wrong. But in case you do not desire to return to me because of the wrong I have done you, take pity on that little angel who knows nothing about this.—I am writing to Ramón to give you what money you need for her, as I do not want my Lolita to suffer.—You know I have an insurance policy in her favor. And the watch that belongs to you, tell me if you want me to send it.—Mother is very ill and if she should die soon, which God forbid, I would go away from this country.—Think over well what you do and don't be childish.—You say that you and your daughter are going to wander. Have you any reason for doing this? Send me your answer by this messenger and be sure always of the love of your (signed) Simón.—Tell me where you are staying so that I may send you money for your daily expenses.''

The defendants also introduced in evidence copies of certain documents and a copy of the declaration made before the district attorney of Guayama by Francisco Menar in the case of *People* v. *Alcaide et al.,* for conspiracy. We have already said that Menar had died before the day of the trial. Although Menar stated in his declaration that he had sexual intercourse on several occasions with María Morales while she was the mistress of Alcaide, he also stated that this was about a year before the birth of María de los Dolores and repeatedly denied that the girl was his daughter or that he had said so to other persons. The defendants concluded by moving for permission to take the depositions of some medical experts of San Juan. The plaintiff objected and the court overruled the motion.

The evidence covers ninety pages of the statement of the case. We have extracted only the parts of it which seem material to give an exact idea of the case. The district court examined the evidence and found that it showed that María

de los Dolores was not the daughter of Alcaide because he had become impotent as a result of the orchitis which he suffered in 1893, but notwithstanding this the court dismissed the complaint on the ground that, considering the time allowed to pass without bringing his action, Alcaide was estopped from repudiating his own acts.

Both parties appealed from that judgment. The appeal which we are now considering is that taken by the plaintiff. The appeal of the defendants was dismissed at the instance of the plaintiff.

We will examine the errors assigned by the appellant in their regular order.

Appellant maintains that the right of a father to impugn the acknowledgment of a natural child is sanctioned by the judgments of the Supreme Court of Spain of June 25, 1910, 15 J. C. 489 (sic), January 5, 1900, 89 J. C. 26, and January 14, 1873, 27 J. C. 221; that in Porto Rico a right of action is lost only by operation of law, and that the action in this case is of a personal nature and is not barred by any special period of limitation fixed by law, falling therefore within the general provision of section 1865 of the Civil Code which fixes for that class of actions the period of fifteen years, and that period has not expired in this case, for which reasons he alleges that the district court erred in applying the doctrine of estoppel to this case and in holding that Alcaide was barred from bringing his action.

Let us first inquire whether the plaintiff had a cause of action. The appellant admits that he has been unable to find any statute expressly recognizing such an action and fixing the time within which it may be brought, but invokes in support of his right the judgments of the Supreme Court already cited and the maxim that whenever there is an injury there must be a remedy, as applied by this Supreme Court of Porto Rico in the case of *Garcia* v. *Garcia et al.,* 18 P. R. R. 926. The appellees maintains that there was no

cause of action and cite in support of this theory the opinion of Escriche.

None of the judgments of the Supreme Court of Spain rendered or published on June 25, 1910, have any bearing on this case. Nor does the judgment appearing on page 489 of volume 15 of *Jurisprudencia Civil*. The other judgments are correctly cited.

That of January 5, 1900, 89 *J. C.* 26, lays down the following jurisprudence:

"The acknowledgment of a natural child by the putative parents, who marry before or after the acknowledgment, gives the child the condition and standing of a legitimate child for all lawful purposes attributed to this class of children, and, supposing such an acknowledgment, there is nothing in our ancient or modern laws authorizing any arbitrary modification of such an acknowledgment in prejudice of the child's interest."

"Nor when a child is in possession of a status of such nature does it appear permissible to make a mere investigation of the actual paternity of him who considered as his child the child enjoying such possession, unless it is for the purpose of showing that the legitimated child did not possess the relative conditions required by law, or the absolute condition of not being the child of the acknowledger, or his impotence, because it is the child of another person; for otherwise, and considering the mystery surrounding paternity and the legal presumption of its existence established by law on the ground of the acknowledgment or the possession of the status, no other presumption can legally prevail against it however persuasive it may appear to be."

The facts from which this doctrine originated were the following:

The duke of Sevilla married Josefina Paradé in 1870 and acknowledged as their daughter a girl named María who was born before they were lawfully married. Many years after they were married two daughters, Marta and Enriqueta, were born and the question first arising in the home was aggravated at the thought of whether the daughter that reminded the mother of a former sin or the older of the

two born under lawful wedlock in an opulent home should inherit the duchy of Sevilla. The duke died. The acknowledged daughter obtained a court decree in her favor in an *ex parte* proceeding and then the duchess of Sevilla brought the action referred to on behalf of her daughter Marta against María, alleging that the latter was not in fact her daughter. Among other evidence there was introduced a document signed by the duke, as follows:

"Being ignorant of the lot that Providence has in store for me, and as it may be possible that my days are numbered, in order to safeguard the interests and rights of my beloved and unfortunate daughters Marta de Borbón and Enriqueta de Borbón, who are my only daughters and are legitimate, I entrust this writing to my beloved wife, Josefina Paradé y Libié, Duchess of Sevilla, so that upon my death she may defend the rights of the two beings whom I love so much.—Having had no children during the first years of our marriage and believing that, considering the time elapsed, we would never enjoy that happiness, at the request of my wife I decided to bestow my name upon and to have considered as my daughter a girl whom my wife had sheltered, who stayed in Paris under the name of Mahía Pahadé at the Bohnier boarding-school and under the name of María Sevilla at the boarding-school of Madame Jourdani and under the latter name in another school of 'Angulema until the day when she first bore my name, being thereafter considered as our daughter. Providence having been so kind as to give me on May 5, 1880, my adored daughter Marta and on June 28, 1885, my other much beloved daughter Enriqueta, the situation of my legitimate daughters, my true and only daughters, was critical in the face of the claims of the girl to whom, out of pity, I had given my name and by which she is known in the Royal College of Santa Isabel (Madrid); and although in a moment of folly I acknowledged her, I can not ignore the duty of a loving father, the voice of blood and of conscience, or the right that my real daughters have, so that nobody may claim what is theirs and so that they may know the truth."

Notwithstanding the written statement of the father and the attitude of the mother, the court entered judgment for the defendant. The plaintiff appealed and obtained in the

superior court a reversal of the judgment. But the defendant then appealed in cassation to the Supreme Court which reversed the decision of the superior court, leaving in effect the judgment of the trial court, María, the acknowledged natural daughter legitimated by a subsequent marriage, remaining in possession, by inheritance from her father, of the duchy of Sevilla.

The other judgment cited by the appellant, or that of January 14, 1873, 27 *J. C.* 218, was entered in an action brought by Antolina González for the annulment of a will. Lorenzo Fuentes acknowledged a certain girl as his natural daughter at the time of her baptism. Thereafter Bruno Fernández, a first sergeant in the Spanish army, being about to be executed, made a will wherein he acknowledged the same girl as his natural daughter, born of his amorous relations with Francisca Sanjuán while both were unmarried. The mother of Fernández, Antolina González, attacked the will. Francisca Sanjuán alleged that it was true that the girl was the daughter of Fernández and that what occurred at the time of her baptism was that she feared that Fernández would not acknowledge his daughter and his friend Lorenzo Fuentes, having knowledge of this, was willing to acknowledge her as his daughter although he knew that she really was not. The complaint was dismissed, the judgment of the lower court was affirmed on appeal and the appeal in cassation from the latter judgment was dismissed.

The jurisprudence established was epitomized as follows:

"In giving more weight to a will wherein it is stated and acknowledged that a girl is the natural daughter of the testator and is designated as his heir than to a certificate of baptism in which it appears that she is the natural daughter of another, subdivision 4 of section 280 of the Law of Civil Procedure is not violated; because in considering and giving preference or greater weight to other evidence than to the said sacramental certificate, it is not meant that the latter is not a public and solemn document, as it is in this case as prior to the law of the civil register.

·"That Law XI of Toro prescribes only, in order that the child may be considered a natural child, that when the child was born or conceived the father could have lawfully married the mother without dispensation, and that the father acknowledged the child."

Although by both judgments the complaints were finally dismissed, it is necessary to recognize the importance of the jurisprudence therein laid down for the purpose of determining the existence of a cause of action for the annulment of the acknowledgment of a natural child. The appellee maintains, however, that there is no similarity between the cases decided by the Supreme Court of Spain and the case now submitted to the Supreme Court of Porto Rico, and cites the opinion of Escriche as follows:

"Being free to acknowledge or not his natural child, the father, although he may be a minor, can not revoke an acknowledgment already lawfully made by him. Such an acknowledgment is not a liberality so to speak, but the statement of a fact to which the law attaches certain advantages and after this declaration of paternity is made the child acquires a status of filiation of which it cannot be deprived. * * * "

"Every acknowledgment by a father or mother, and even every claim of the child, may be controverted by such persons as may have an interest in it. The child, as the first in interest, may attack its acknowledgment by a man or woman whom he considers as strangers, proving that neither the former could be his father, nor the latter his mother. The mother may also attack an acknowledgment made by an alleged father, because it can not be left to the caprice of any unscrupulous man to cause himself to be considered as the father of the child of an opulent widow or unmarried woman who may have disgraced herself. The father may likewise repudiate the acknowledgment which, though rarely, an alleged mother may make with speculative intent. In short, every acknowledgment untruthfully made may be attacked by any person prejudiced thereby."

The language of Escriche has not all the significance that the appellees ascribe to it. In our opinion it is impossible to deny the existence of the cause of action. The reasoning in the case of *Garcia* v. *Garcia et al., supra,* is applicable.

It is conceivable that such facts may be presented as would demand the intervention and action of the courts to annul an acknowledgment, notwithstanding the fact that the father acted voluntarily at the time of making it. Furthermore, although there is no statute directly governing the matter, the legislation in connection with legitimate children indicates a criterion of the Legislature favorable to the existence of the cause of action. We refer to sections 181, 182, 183, 184 and 185 of the Civil Code. It is clear that the evidence presented must be so strong and convincing that in annulling an acknowledgment voluntarily made the court is fully convinced that that and no other is the action demanded by justice.

Having reached the foregoing conclusion, the question immediately arises whether the action was brought within the time allowed by law, or whether the right had become extinguished when Alcaide decided to take the matter before the courts.

Let us hear the trial judge on this point. In this opinion he said:

"Where a person wilfully makes a representation intended to induce another to act upon the faith of it, or where, whatever his intention, a reasonable man in the situation of the other would believe that it was meant that he should act upon it, and in either case the other does act upon it as true and alters his position, there is an estoppel *in pais* to conclude the former from averring against the latter a different state of things as existing at the same time. *Newhall* v. *Hatch*, 64 Pac. 250; *Gerlach* v. *Turner*, 89 Cal. 446; *Beugnot* v.*Tremoulet*, 111 La. 1; *Dwyer* v. *Woulfe*, 39 La. Ann. 423; *Schroeder* v. *Young*, 161 U. S. 334; *Armstrong* v. *Am. Exch. Nat. Bank*, 133 U. S. 433; *Fields* v. *Killion*, 129 Ala. 373; *Driscoll* v. *Smith*, 184 Mass. 221; *Scofield* v. *Farmer*, 125 Mich. 470; *Woodhaven J. L. Co.* v. *Solly*, 148 N. Y. 42.

"Applying this principle we find that Alcaide appeared voluntarily before the Municipal Judge of Arroyo on October 3, 1900, and acknowledged the minor María de los Dolores as his natural daughter. That thereafter he paid for her education and support

and publicly considered her as his daughter and treated her as such, creating by his acts the status of acknowledged natural daughter which changed the condition of said minor.

"But the plaintiff alleges that he acted in that manner and acknowledged the girl because of the suggestions and requests of the mother, María Morales, who made him believe that the girl was his daughter, and therefore his acts were due to the deceit and fraud of María Morales. But it appears from the evidence that the plaintiff knew of the disease he suffered in 1893, sterility being one of its results; that he knew of his sterility in 1904 and his friends indicated to him that María de los Dolores was not his daughter, and still he let time pass without exercising his right and not only did he not repudiate the consequences of his act, but continued to support the minor María de los Dolores and to treat her as his natural daughter, causing by his acts the girl to be considered by the people as his and María Morales' daughter as the offspring of their amorous relations.

"A neglect to do something which one should do or seek to enforce a right at a proper time has been termed, with questionable propriety, 'estoppel by laches.' 16 Cyc. 680. *Hunt* v. *Reilly*, 23 R. I. 471

"Negligent silence may work an estoppel as effectually as an express representation. *Tobias* v. *Morris*, 126 Ala. 535.

"There is no doubt that the plaintiff has been negligent in the assertion of his right. This girl was born in the year 1897 when Alcaide was more than thirty years of age and had a mature and reflecting judgment, but nevertheless, being in a position to inquire into the truth of the paternity of the girl, he did not, but on the contrary acknowledged her on the representations of the mother alone, all living in Arroyo. Thereafter he ignored the indications of his friends and married and in 1904 becomes convinced of his sterility, and notwithstanding all this he continued to support the minor and strengthened her status of natural daughter. The year 1904 went by and he delayed fourteen years in correcting the error committed by lightly performing an act of such importance as the acknowledgment of a child without first ascertaining whether the child was actually his. There is no doubt that this shows such a degree of negligence as to operate an estoppel which deprives him of the right to attack the acknowledgment."

The opinion of the district court is not perfectly clear as

to whether the rule applied is that of estoppel *in pais* or of estoppel by laches.

If it is the former we must conclude that it is not applicable to this case, inasmuch as we have admitted the existence of the cause of action for the annulment of the voluntary acknowledgment made by the father. It is clear that a father who acknowledges a child as his can not, without justification but merely through caprice, repudiate or ask a court to annul the acknowledgment; but if he becomes convinced that the child which he acknowledged as his own is not his child and has evidence sufficient to prove it, the situation changes and he may then repudiate his own acts and ask the court to establish the truth of the matter.

And if it is the latter, we are bound to agree with the appellant on the basis of the rules for the limitation of actions prescribed by the Civil Code of Porto Rico, discarding those independently established by jurisprudence on that point. In Porto Rico if through abandonment or neglect actions are not brought within the periods of time expressly determined by the Legislature they are forever barred, and only these periods of time should be taken into account by the trial court.

In this case, according to section 1865 of the Civil Code, the action being a personal one for which no special period of limitation has been fixed, Alcaide had fifteen years within which to bring his action and as that period was not covered from the time that Alcaide was in a position to bring the action until he filed the complaint, it is necessary to conclude that his action was not barred.

Perhaps that period may seem too long. Perhaps if the doctrine of laches were applicable there might be sufficient grounds for holding, as did the district court, that the negligence of Alcaide for more than ten years was equitably sufficient to extinguish his right of action, but we have no

power to modify the laws and our duty is to apply them just as they were enacted by the Legislature.

Having arrived at the foregoing conclusions, that is, that the court erred in applying to this case the rule of estoppel, and that the action of the plaintiff is not barred, what should be the action of the Supreme Court? If, as seemed logical, the trial court, being convinced, as it apparently was, that the doctrine of estoppel was applicable, had confined itself to applying the said doctrine without entering into an analysis of the evidence, a new trial would be necessary as the only proper solution. But the court went further. It weighed the evidence and decided the question of sterility favorably to the plaintiff, which makes the solution of the problem more difficult.

However, as we have grave doubts as to whether the question of the plaintiff's sterility sufficiently occupied the attention of the court, diverted as it was by the question of estoppel, we believe that the ends of justice demand that a new trial be ordered. In scientific questions depending upon opinions the evidence must be strong, and although it might be said that the plaintiff made out a *prima facie* case in his favor, yet the fact of his sterility depends, in its last analysis, on the testimony of Doctor Amadeo, and his testimony does not entirely satisfy us, at least in its form, that absolute sterility is a necessary consequence of the double orchitis which he suffered. The testimony of other experts, or perhaps citations from scientific works, should have been produced. It is true that it was sought to corroborate the testimony of Doctor Amadeo by the alleged analysis of the plaintiff's semen by the expert Pesquera, but we are not convinced that a proper basis was established for that evidence. In other words, it was not shown clearly in what manner the semen was obtained, or that it had not had time to become devitalized, or that the sample given to Pesquera was really Alcaide's semen. Although the appellee did not duly

object, we are not restricted to the objections as made by the parties, ''but in furtherance of justice, the court may also take cognizance of all the facts and proceedings in the case as they appear in the record, and likewise consider the merits thereof, so as to promote justice and right and to prevent injustice and delay.'' Section 1 of an Act establishing the Supreme Court of Porto Rico as a court of appeals, approved March 12, 1903, page 59. And the interests of justice in this particular case are against depriving the natural daughter of the right to be fully heard before deciding that she is not the natural daughter of the man who acknowledged her as such and likewise against a decision that Alcaide ought not to have a new trial when the finding of the lower court regarding his sterility was entirely in his favor. A new trial will permit of a more conscientious and detailed inquiry into the matter, and whatever the judgment may be it will have more certainty of doing substantial justice.

We have not lost sight of the fact that section 306 of the Code of Civil Procedure, as amended in 1906, provides that when the judgment, order or decree of the court below shall be reversed, this court shall proceed to render such judgment, order or decree as the court below should have rendered, except when it is necessary that some matters of fact be ascertained, or the damage to be assessed or the matter to be decreed is uncertain, in any of which cases the cause shall be remanded for a new trial in the court below. Similar statutes have been construed as not opposed, in proper cases, to the granting of new trials. See 4 C. J. 1185 and 1193. And this court has followed that practice in the case of *Méndez* v. *Martínez*, 21 P. R. R. 238, and others. Besides, it has been necessary to take that course because it has been the only means by which a just and feasible solution has been found, harmonizing the diverse opinions of the justices of this court resulting from a study and consideration of the merits of this case.

The judgment appealed from must be reversed and the case remanded for a new trial, with instructions to the court to decide the questions involved according to the pleadings and the evidence, without any consideration of what may be the probable opinion of this court regarding the merits of the questions.

*Reversed and remanded.*

Chief Justice Hernández and Justices Wolf and Aldrey concurred.

Mr. Justice Hutchison dissented.