DOUGLASS et al. v. THURSTON COUNTY et al.

No. 8185.

Circuit Court of Appeals, Ninth Circuit.

Dec. 7, 1936.

900

James P. Neal, of Olympia, Wash., for appellant receiver.

Roberts & Skeel, E. L. Skeel, and Frank Hunter, all of Seattle, Wash., for appellants Hartford Accident & Indemnity Co. and Great American Indemnity Co.

Karr & Gregory, Day Karr, and Payne Karr, all of Seattle, Wash., for appellants New Amsterdam Casualty Co. and Fidelity & Casualty Co.

Smith Troy, Pros. Atty., Thurston County, Harold P. Troy, and Julia Waldrip Ker, all of Olympia, Wash., for appellees.

Before WILBUR, GARRECHT, and MATHEWS, Circuit Judges.

GARRECHT, Circuit Judge.

Seeking payment of a deposit of public money, together with interest thereon, the appellees filed suit in the superior court of Thurston County in the state of Washington. By proper proceedings, the cause was removed to the court below.

The Olympia National Bank closed its doors on January 22, 1932, and a receiver thereupon was appointed by the Comptroller of the Currency of the United States. At the time of closing, the bank's deposit liability to the appellees aggregated $60,-444.15, including interest accruing up to and including the suspension date. At all times such deposit liability was secured to the extent authorized by the national banking laws with reference to public deposits.

At the time of the bank's closing, the public funds of the appellees there on deposit were secured by collateral of a par value of $61,940.32 and of a stipulated market value, as of January 22, 1932, of $48,900.32. As of March 27, 1934, the day before the trial, the market value of the securities was stipulated to be $49,230.32.

These collateral securities were furnished by the bank in addition to five compensated surety depositary bonds, in the total penal amount of $47,500. Two of the bonds were signed by the appellant New Amsterdam Casualty Company, and each of the remaining three bonds was signed by one of the three other appellant surety companies herein.

All of the bonds and all of the securities were held by the appellee treasurer to secure the payment of the total of the deposit liability. There was no segregation of the deposit and there was no provision that any given portion of the bonds or securities should apply to any given portion of the deposit.

After the bank closed, the appellee treasurer requested permission of the appellant receiver to take over the collateral securities, which the appellee treasurer had

placed into his safety deposit box in the bank. Such permission was refused. Demand was also made by the appellee County upon the appellant surety companies for the payment of the penalty amounts of the bonds. That demand likewise was refused. The appellee treasurer testified that the appellant receiver refused to make settlement or to permit the use of the additional securities for such purpose, on account of the differences between the receiver and the bonding companies as to relative liability.

On October 6, 1932, the first dividend was declared and there became applicable upon the claim of the County the sum of $10,878.28. A second dividend became payable on April 24, 1934, in the sum of $5,439.14, and a third, also for $5,439.14, became payable on March 4, 1935. These dividends, at the rate of 18 per cent., 9 per cent., and 9 per cent., respectively, were delivered to the appellee treasurer on June 9, 1934, and August 18, 1935. Further dividends of $3.33 were paid as of October 29, 1934, and August 19, 1935. The total of all dividends paid to the appellee treasurer amounted to $21,759.89, leaving a balance due of $38,684.26.

On the basis of the relationship of the market value of the collateral securities at the time of the bank's suspension and the penal amounts of the various depositary bonds to the total sum due to the appellees, the court below allocated certain proportionate shares of the sum due to be paid by the appellant receiver and the appellant surety companies. The court then deducted from the "total obligation" of the surety companies, as thus allocated, amounting to $29,783.15, the total amount of dividends that had been paid by the receiver to the appellees, amounting to $21,759.89. This deduction left the sum of $8,023.26 as "the principal balance of indebtedness due from the sureties," which sum the court, in its final findings of fact, "prorated among the sureties according to the relation of the amount of the individual surety bond to the total amount of all surety bonds."

The court also held that no part of the dividends paid to the appellees by the appellant receiver should be credited upon that part of the obligation due to the appellees for which the receiver is primarily responsible; and that, when the appellant bonding companies pay the several amounts found to be due from them, each of them shall be entitled to the transfer of a corresponding proportion of the appellees' claim against the receiver, "which said transferred claim shall be a general claim against the assets" of the bank.

The decree provided that the appellees have judgment against the appellants, in the manner hereinabove outlined, in the sum of $38,684.26, together with interest on $60,444.15, the total deposit liability on January 22, 1932, the suspension date, from such date to June 9, 1934, the date on which the first dividend, of 18 per cent., was paid to the appellees; interest on $49,565.27 from June 9, 1934, to August 18, 1935, the date on which the second and third dividends, of 9 per cent. each, were paid; and interest on $38,684.26 from August 18, 1935, until paid. All such interest was to be at the rate of 6 per cent. per annum. The receiver's liability for interest, which was to be paid from the amount realized upon the sale of the collateral, was limited to the period of one year from January 22, 1932, on the sum of $30,661, which the court determined to be the receiver's "primary proportionate liability." The appellant surety companies were ordered to pay all other items of interest allowed by the decree, in proportionate amounts.

In an interlocutory decree, handed down on July 19, 1935, the court ordered that the securities pledged by the bank to the County be delivered to the receiver, P. J. Mourant, as special master of the court, and that a sufficient amount of the collateral be sold by him to pay the amount determined to be the receiver's prorated liability, including interest. On October 1, 1935, Mourant reported to the court that from the sale of bonds and the collection of interest due thereon, he had received $39,448.89, and that there remained in his possession securities having a par value of $32,740.32.

The final decree ordered the special master to pay to the appellee county treasurer the sum of $30,661, together with interest at 6 per cent. for one year, out of the proceeds from the sale of the securities. The decree also provided that any part of principal or interest that the appellees are unable to recover from the surety companies should be paid by the receiver from such proceeds, and that, upon payment of all amounts—principal, interests, and costs—that have been determined to be due to the appellees, any cash and securities then remaining in the hands of the

special master shall, under decree of the court, be delivered to the receiver for use in the further liquidation of the affairs of the bank.

From the foregoing decree, the receiver as well as the sureties have appealed. The receiver has paid the pro-rated portion of liability in compliance with the decree. No sum has been paid by any of the surety companies.

It is the contention of the receiver that the final settlement by him should have been based upon a credit of dividends paid, and a "pro-rating of liabilities giving consideration thereto"; and that no interest should be considered as a secured amount, but should be subject to payment as interest may be paid upon other claims in the course of the liquidation of the bank's affairs.

The surety companies maintain that Thurston County should first be paid by applying in full the principal's assets, i. e., the collateral securities, to the creditor's loss, and then requiring the sureties to contribute any balance remaining unpaid. In the event that this court does not agree with them in their "primary" contention that the loss should not be prorated among the collateral and the surety companies, the latter then present certain alternative questions as to the basis for pro-rating. In our view of the case, these alternative questions, save as they bear upon the problem of interest, need not here be considered.

At the outset, it should be observed that the proceeds from the sale of part of the collateral, $39,448.89, and the total dividends already paid to the county treasurer, $21,759.89, aggregate $61,208.78, or more than the deposit liability, including interest, at the date of the bank's closing. In addition, as we have seen, there have remained in the hands of the special master unsold securities, forming part of the treasurer's collateral, having a par value of $32,740.-32. From this it is evident that the collateral securities and the paid dividends are more than sufficient to reimburse the County the amount of its deposit, together with interest, without the necessity of recourse against the surety companies.

The receiver bases his contention that the deposit liability should be pro-rated, with the collateral paying only its proportionate share on the basis of the relationship of the penal amounts of the bonds and the market value of the securities to the total deposit liability, upon the following provision appearing in each of the surety bonds:

"Second. The above named surety shall be liable hereunder for such proportion of the moneys deposited with said principal by the county treasurer of said county, and payment of which is refused by said principal upon demand of the county treasurer of said county as provided in the condition of this bond as the penalty of this bond bears to the total amount of depositary bonds and other securities for deposits furnished by the above named principal to the county treasurer of said county; provided, however, that if such other bonds or securities are insufficient for any reason to fully make, together with the aforesaid proportion under this bond, the full amount of principal and interest demanded and refused and interest thereafter accruing to time of actual payment to the county treasurer of said county, or if the surety on any other bond shall have been adjudged to be or be insolvent, then and in that event the surety hereunder shall be liable to the county treasurer of said county to the full amount of loss sustained by reason of such insufficiency.

"Third. The total liability of the above mentioned surety hereunder shall not exceed the penalty of this bond."

The appellees base their argument that the court below was correct in allowing interest of 6 per cent. "for the period of non-payment or withholding of the county funds after the closing of the bank," upon the following provision of the depositary contract between the bank and the County:

"In the event the party of the first part becomes insolvent or the checks or demands of the party of the second part, acting by and through its Treasurer, are not met and complied with by the payment of the moneys on deposit, then such fund on deposit shall bear interest from the date of insolvency or default and refusal and neglect to pay, at the rate of six per centum per annum."

The county depositary's contract also contains the following paragraph:

"It is expressly understood and agreed by and between the parties hereto that such surety bond, or bonds, and such securities already on file or on deposit, as aforesaid, or which may hereafter be filed or deposited, shall be alike applicable to the provi-

sions of this contract and the designation, or designations, on which it is based, and to future designations and contracts between the parties hereto."

Each of the bonds in this case recites that, "The condition of this obligation is such that if said principal shall fully comply with said contract [of deposit] in all particulars," etc.

In reply to the receiver's contention that the depository bonds themselves provide for pro-rating liability by collateral and sureties, the surety companies assert that, under the decisions of the Supreme Court of the state of Washington, the provision invoked by the receiver does not in reality "permit pro-rating the loss nor vary the general rule that a surety is entitled to have assets of his principal pledged as security for the indebtedness applied in full toward a discharge of the obligation which is in default, leaving the surety to make up any balance."

As a "secondary issue," the appellant surety companies also declare that, regardless of the weight to be given to the Washington decisions, "the sureties under the terms of the bonds in question did not waive their right to be subrogated to all the rights of the county against the collateral-securities pledged by their principal." In our view of the case, however, it will not be necessary to consider this secondary issue in detail.

Before examining the decisions of the state Supreme Court regarding the crucial provision in the surety bonds relative to proportionate liability, we must first determine whether or not, in the instant case, a federal court should be bound by such decisions.

On this point, the court below, in a memorandum opinion, expressed the view that, since a correct determination of the case "rests upon rights growing out of the doctrine of subrogation, which is a creature of equity," any rule of conformity of federal to state decisions is inapplicable.

We are unable to concur in this view.

■ The mere fact that R.S. § 721 (28 U.S.C.A. § 725) requires that the laws of the several states shall be regarded as rules of decisions in trials at common law in federal courts does not, by implication, exclude such laws as rules of decision in equity cases. This precise point was decided by the Supreme Court in Mason v. United States, 260 U.S. 545, 558, 559, 43 S.Ct. 200, 204, 67 L.Ed. 396, where the following language was used:

"It was urged upon the argument that section 721 of the Revised Statutes [28 U.S.C.A. § 725], which provides that the laws of the several states shall be regarded as rules of decision in trials at common law in the courts of the United States, by implication excludes such laws as rules of decision in equity suits. The statute, however, is merely declarative of the rule which would exist in the absence of the statute. [Cases cited.] And it is not to be narrowed because of an affirmative legislative recognition in terms less broad than the rule. The rule that an affirmative statute, without a negative express or implied, does not take away the common law [authorities cited] affords an analogy. [Cases cited.]

"There are numerous cases, both in this court and in the lower federal courts, where the rule has been applied in suits in equity, and while section 721 was not mentioned, it is scarcely possible that it was overlooked."

■ Particularly in cases involving the interpretation of contracts are federal equity courts disposed to adopt the construction placed upon similar contracts by the Legislatures and the courts of the states where the contracts were executed.

In Brine v. Insurance Co., 96 U.S. 627, 637, 639, 24 L.Ed. 858, the court said:

"But there is another view of the question which is equally forcible, and which leads to the same result. All contracts between private parties are made with reference to the law of the place where they are made or are to be performed. Their construction, validity, and effect are governed by the place where they are made and are to be performed, if that be the same as it is in this case. It is, therefore, said that these laws enter into and become a part of the contract. * * *

"We are not insensible to the fact that the industry of counsel has been rewarded by finding cases even in this court in which the proposition that the rules of practice of the Federal courts in suits in equity cannot be controlled by the laws of the States, is expressed in terms so emphatic and so general as to seem to justify the inference here urged upon us. But we do not find that it has been decided in any case that this principle has been carried so far as to deny to a party in those courts substantial

rights conferred by the statute of a State, or to add to or take from a contract that which is made a part of it by the law of the State, except where the law impairs the obligation of a contract previously made."

Again, in Mason v. United States, supra, 260 U.S. 545, at page 557, 43 S.Ct. 200, 203, 67 L.Ed. 396, the following language is found:

"Subject to certain exceptions, the statutes of a state are binding upon the federal courts sitting within the state, as they are upon the state courts. One of the exceptions is that these statutes may not be permitted to enlarge or diminish the federal equity jurisdiction. [Case cited.] That jurisdiction is conferred by the Constitution and laws of the United States and must be the same in all the states. [Case cited.] But while the power of the courts of the United States to entertain suits in equity and to decide them cannot be abridged by state legislation, the rights involved therein may be the proper subject of such legislation. [Case cited.]"

The binding effect of state law upon federal courts, even though sitting in equity, was again emphasized by the Supreme Court in Missouri, Kansas & T. Trust Co. v. Krumseig, 172 U.S. 351, 358, 359, 19 S. Ct. 179, 182, 43 L.Ed. 474:

"But it is strenuously argued, and of that opinion was Circuit Judge Sanborn [(C.C.A.) 77 F. 32] in the present case, that federal courts, in the exercise of their equity jurisdiction, do not receive any modification from the legislation of the states or the practice of their courts having similar powers, and that consequently no act of the legislature of Minnesota could deprive the Federal courts sitting in equity of the power or relieve them of the duty to enforce and apply the established principle of equity jurisprudence to this case that he who seeks equity must do equity, and to require the appellees to pay to the appellant what they justly owe for principal and lawful interest as a condition of granting the relief they ask.

"We think it a satisfactory reply to such a proposition that the complainants in the present case were not seeking equity, but to avail themselves of a substantive right under the statutory law of the state. It seems to be conceded, or, if not conceded, it is plainly evident, that if the cause had remained in the state court, where it was originally brought, the complainant would have been entitled, under the public policy of the state of Minnesota, manifested by its statutes as construed by its courts, to have this usurious contract canceled and surrendered without tendering payment of the whole or any part of the original indebtedness. The defendant company could not, by removing the case to the federal court, on the ground that it was a citizen of another state, deprive the complainants of such a substantive right. With the policy of the state legislation the federal courts have nothing to do. If the states, whether New York, Arkansas, Minnesota, or others, think that the evils of usury are best prevented by making usurious contracts void, and by giving a right to the borrowers to have such contracts unconditionally nullified and canceled by the courts, such a view of public policy, in respect to contracts made within the state and sought to be enforced therein, is obligatory on the federal courts, *whether acting in equity or at law. The local law, consisting of the applicable statutes as construed by the supreme court of the state, furnishes the rule of decision.*" (Italics our own.)

Similarly, in the instant case, the court below, while agreeing with the appellant surety companies in their interpretation of the Washington decisions, regarded itself as not bound by those decisions, since the question was one of subrogation, "a creature of equity." Accordingly, the court below decided the case by applying what it conceived to be "the established principle of equity," instead of following the state decisions.

In Jeems Bayou Fishing & Hunting Club v. United States, 260 U.S. 561, 565, 43 S.Ct. 205, 206, 67 L.Ed. 402, likewise an equity case, the court held that in the measure of damages it would be governed by the state law, "as interpreted by the decisions of the highest court of that state."

See, also, Reconstruction Finance Corporation v. Farmers State Bank (C.C.A.5) 80 F.(2d) 978, 979; Collins Mfg. Co. v. Wickwire Spencer Steel Co. (D.C.) 14 F. (2d) 871, 873; Pierrepont v. Fidelity-Philadelphia Trust Co. (D.C.) 32 F.(2d) 608, 609; 25 C.J. 829 and 845.

The bonds herein were given by the bank in compliance with a state statute, 2 Rem.Comp.Stats. of Washington 1922, § 5563, which reads as follows:

"Before any such designation [of a bank as county depositary] or designations

shall become effectual and entitle the said treasurer to make deposits in such bank or banks, the bank or banks so designated shall within ten days after such designation òr designations have been filed, file with the county clerk of such county a surety bond to such county treasurer, properly executed by some reliable surety company qualified under the laws of this state to do business therein, in the maximum amount of deposits designated by said treasurer to be carried in such bank or banks, conditioned for the prompt and faithful payment thereof on checks drawn by such treasurer, which bond must be approved by the chairman of the board of county commissioners, the prosecuting attorney and the county treasurer, or any two of such officers of said county, before being filed with the county clerk, and unless so approved the same shall not be received or filed by the county clerk: Provided, that said depositary or depositaries may deposit with the county treasurer good and sufficient municipal, school district, county or state bonds or warrants, United States bonds, first mortgage railroad bonds listed on the New York stock exchange, or local improvement bonds or warrants whose legality have [sic] been passed upon favorably by the supreme court, or public utility bonds or warrants issued by or under the authority of any municipality of the state for water, power or light plants or maintenance thereof upon which principal or interest ·is not in default at the time of such deposit, the aggregate market value of which shall not be less than the amount required in said deposit, in lieu of the surety bond herein provided for."

It is well settled that liability on an official bond required by state law is governed, even in federal courts, by the statutes and decisions of the state requiring the bond. Both the rule and the pressing reason therefor were lucidly expounded in· Bassinger v. United States Fidelity & Guaranty Co. (C.C.A.8) 58 F.(2d) 573, 574, certiorari denied 287 U.S. 622, 53 S. Ct. 21, 77 L.Ed. 540:

"This bond is a Nebraska contract made in connection with a state officer of the state of Nebraska. It would be very unfortunate if the liability upon bonds required by the statutes of a state and covering its officers should be subject to one rule in the courts of that state and to another in the federal courts. Whether, ordinarily speaking, the construction and ap-plication of bonds is a matter of general law or not, we think that, in ·respect to official bonds on state officers, the law of the state should be followed by federal courts. If this be true, the important matter is to discover the rule in Nebraska. For our purposes, it is fortunate that the exact verbiage of this bond seems to be that of a form used for years in the state of Nebraska in official bonds and which has been several times construed."

See, also, City of Beckley v. Moran (C.C.A.4) 61 F.(2d) 238, 240; Town of Hamden v. American Surety Co. of New York (D.C.) 9 F.Supp. 733, 738.

Paraphrasing the language of the Bassinger decision, these bonds are Washington contracts made in connection with a county officer and a public depositary of the state of Washington. It would be very unfortunate if the liability upon bonds required by the statutes of a state and protecting its officers and its county deposits should be subject to one rule in the courts of that state and to another in the federal courts. Whether, ordinarily speaking, the construction and application of bonds is a matter of general law or not, we think that, in respect to official bonds covering public deposits by county officers, the law of the state should be followed by federal courts. If this be true, the important matter is to discover the rule in Washington. For our purposes, it is fortunate that the exact verbiage of these bonds seems to be that of a form used for years in Thurston County in depositary bonds—a form closely similar to others that have been construed by the Supreme Court of the state.

In this connection, it should be borne in mind that the National Bank Act itself, as amended, recognizes the authority of state law as regards the public deposits of a state or any political subdivision thereof. The pertinent provision of 12 U.S.C.A. § 90, as amended, is as follows:

"Any [national banking] association may, upon the deposit with it of public money of a State or any political subdivision thereof, give security for the safekeeping and prompt payment of the money so deposited, of the same kind as is authorized by the law of the State in which such association is located in the case of other banking institutions in the State."

In a recent decision involving the identical national bank represented by the appellant receiver herein, we referred to·

cases holding that the main purpose of the foregoing provision was to equalize the position of national and state banks in competing for public deposits. Capital Savings & Loan Ass'n v. Olympia Nat. Bank (C.C.A.) 80 F.(2d) 561, 564–565.

We now turn to an examination of decisions by the Supreme Court of the state of Washington, construing surety bonds containing provisions similar to those found in the bonds given in the instant case, such former bonds having been given in compliance with a state statute substantially similar to section 5563, supra.

In State v. Hartford Accident & Indemnity Co., 140 Wash. 278, 248 P. 432, the court had before it two surety bonds given by a national bank to cover public deposits made by the state treasurer. The state was also secured by Liberty bonds that the bank had deposited as collateral, having given to the state a power of attorney authorizing their sale. The bonds and the collateral were both given in pursuance of 2 Rem.Comp.Stat. § 5549, which reads as follows:

"Every state depositary, before it shall be entitled to receive any state moneys, shall file with the state treasurer a good and sufficient bond of a surety company authorized to do business in this state, to be approved by said board [of finance] as security and pledge for the payment on demand to him or his order, free of exchange, at any place in this state designated by him, of all such moneys deposited with it, and of interest thereon at the rate fixed by said board, which bond shall be at least equal to the amount of the moneys to be received by said depositary of said state, and shall, before deposit, be approved by said board. The state board of finance may require the state auditor or the state bank examiner to thoroughly investigate and report to it concerning the condition of any bank which makes application to become a state depositary, and may also as often as it deems necessary require such investigation and report concerning the condition of any bank which may have been designated as such depositary, the expense of such investigation to be borne by the depositary examined: Provided, that said depositary may deposit with the state treasurer good and sufficient municipal, school district, county or state bonds or warrants or United States bonds, first mortgage railroad bonds listed on the New York Stock Exchange, local improvement bonds or warrants whose legality have [sic] been passed upon favorably by the supreme court, or public utility bonds or warrants issued by or under the authority of any municipality of the state for water, power or light plants or the maintenance thereof upon which principal or interest is not in default at the time of such deposit, the aggregate market value of which shall not be less than the amount required in said deposit, in lieu of the surety bond herein provided for."

In the Hartford Case, supra, the court said:

"The question is whether it was the duty of the state treasurer to apply the entire proceeds of the Liberty bonds in liquidation of the insolvent bank's indebtedness before it [he?] resorted to the surety bonds. If it was his duty so to do, then the amount paid to [by?] the respondent [surety company] covered its liability. In the absence of anything in the statute or the bond to the contrary, it was the duty of the treasurer first to apply the entire proceeds of the collateral to the discharge of the bank's indebtedness, and then resort to the bonds for the balance, and, if this is not done, the surety is to the extent that the creditor failed to apply the proceeds of the collateral discharged from liability. Section 480, vol. 1, Brandt, Suretyship and Guaranty (2d Ed.), states the law as follows:

"'If the creditor has a surety for the debt, and also has a lien on property of the principal for the security of the same debt, and he relinquishes such lien, or by his act such lien is rendered unavailable for the payment of the debt, the surety is, to the extent of the value of the lien thus lost, discharged from liability. This rule does not depend upon contract between the surety and creditor, but results from equitable principles inherent in the relation of principal and surety. It is equitable that the property of the principal, pledged for the payment of the debt, should be applied to that purpose, and it is grossly inequitable that in such case the property should be diverted from that purpose, and the debt thrown upon a mere surety. Upon obtaining such a lien the creditor becomes a trustee for all parties concerned, and is bound to apply the property to the purposes of the trust. * * *'

"It is unnecessary here to assemble the cases which support the text-writer, because there is no controversy over the gen-

eral proposition of law there stated. If the state was justified in not applying the entire proceeds of the collateral to the payment of the indebtedness, it is by virtue of paragraph 3 of the bond, which is as follows:

" 'The above-named surety shall be liable hereunder for such proportion of the moneys deposited with said principal by the state of Washington, and payment of which is refused by said principal upon demand of the treasurer of the state of Washington, as provided in the condition of this bond, as the penalty of this bond bears to the total amount of other surety bonds or 75 per centum of the total amount of collateral securities furnished by the above-named principal to the state of Washington or to the treasurer thereof as security and pledge for the payment to the said state of Washington or the treasurer thereof all moneys deposited with said principal under and in conformity to the said laws of the state of Washington; provided, that in such an event the state may hold the surety for its proportionate liability hereunder without . first having recourse to collateral securities deposited by the principal; provided, further, that, if such other surety bonds or collateral securities are insufficient for any reason to fully make, together with the aforesaid proportion under this bond, the full amount of principal and interest demanded and refused and interest thereafter accruing to time of actual payment to the treasurer of the state of Washington, then and in that event the surety hereunder shall be liable to the state of Washington to the full amount of loss sustained by reason of such insufficiency.'

"It will be observed that the surety is liable to the extent the 'penalty of this bond bears to the total amount of other surety bonds or' (not and) '75 per centum of the total amount of collateral securities furnished by the above-named principal to the state of Washington or to the treasurer thereof.' The state's argument appears to be rested on the assumption that the word 'or' should be read 'and,' but, if this should be done, a different contract would be made than the parties made for themselves. It must be admitted that the clause following the word 'or' in the bond is somewhat mystifying, and its real meaning is difficult to determine. There is, however, nothing in the bond which would indicate that the general rule of law above

mentioned is not to apply or that the surety has in any way consented that the state might release a part of the proceeds of the collateral.

"Attention is called to that clause in the bond which provides that the state may hold the surety for its proportionate liability without first having recourse to the collateral deposit by the principal. That clause can have no application here, because the state did not proceed to collect from the sureties without resorting to the collateral. It sold the Liberty bonds and disposed of the proceeds. We shall not attempt here to determine under what state of facts the clause in the bond after the word 'or' would cover. There being no clause in the bond which authorized the state to return a part of the proceeds of the collateral to the receiver of the insolvent bank, it follows that the sureties were discharged to the extent that the state treasurer failed to apply the proceeds of the Liberty bonds upon the indebtedness of the insolvent bank."

It should be observed that the bonds in the instant case do not contain any provision authorizing the County to "hold the surety for its proportionate liability hereunder without first having recourse to collateral securities deposited by the principal."

The appellant receiver herein seeks to distinguish the Hartford Case from the present controversy by asserting that the state Supreme Court "placed great stress upon the fact that the word 'or' rather than 'and' was used in the" sentence dealing with proportionate liability, as set out in the Hartford bond. The receiver points out that "in the bonds involved in the present matter the word 'and' has been substituted for the word 'or.' "

The force of this objection by the receiver, however, is completely destroyed by the decision of the Supreme Court of Washington in the companion case of State v. Maryland Casualty Company, 140 Wash. 701, 248 P. 434. In that case, the pertinent provisions of the surety bond are not set out in the opinion, but are to be found quoted in the opening brief filed by the state of Washington, the appellant therein. A certified copy of the brief has been lodged in this court on this appeal.

The bond in the Maryland Casualty Case contained the following paragraphs:

"Third. The above named surety shall be liable hereunder for such proportion of

908

the moneys deposited with said principal by the State of Washington, and payment of which is refused by said principal upon demand of the treasurer of the State of Washington as provided in the condition of this bond as the penalty of this bond bears to the total amount of bonds *and* other securities furnished by the above named principal to the State of Washington or to the treasurer thereof as security and pledge for the payment to said State of Washington or the treasurer thereof of all state moneys deposited with said principal under and in conformity to the said laws of the State of Washington, provided, however, that if such other bonds or securities are insufficient for any reason to fully make, together with the aforesaid proportion under this bond, the full amount of principal and interest demanded and refused and interest thereafter accruing to time of actual payment to the treasurer of the State of Washington, then and in that event the surety hereunder shall be liable to the State of Washington to the full amount of loss sustained by reason of such insufficiency.

"Fourth. The total liability of the above mentioned surety hereunder shall not exceed the penalty of this bond." (Italics our own.)

In the Maryland Casualty Case, the state tribunal handed down the following per curiam opinion:

"This is a companion case to that of the State of Washington v. Hartford Accident & Indemnity Company. [140 Wash. 278] 248 P. 432, just decided, and upon the authority of that case the judgment in this case will be affirmed."

In other words, the state Supreme Court sustained the lower court in its holding that the state, having collateral security which had been sold, should have applied the whole thereof to the reduction of the amount due from the bank, and that the balance should have been divided by two, one-half to be paid by the Maryland Casualty Company, the respondent therein, and the other one-half to be paid by the Hartford Accident and Indemnity Company.

In Maryland Casualty Company v. Grays Harbor County, 159 Wash. 356, 368, 369, 293 P. 441, the Supreme Court of Washington recognized and tacitly approved the doctrine of the Hartford Case, but held that the facts presented in the Grays Harbor Case were distinguishable from those involved in the Hartford decision.

■ It should be borne in mind that the five bonds in the instant case were not provided on forms prepared by the surety companies, but were drawn up on Thurston County forms, adopted by the State Bureau of Inspection and Supervision of Public Offices. Furthermore, while three of the five bonds were originally executed before the two state decisions above referred to were handed down, those three bonds were all renewed after the dates of those decisions. It is therefore not reasonable to assume that the surety companies intended to waive their right of subrogation under those bonds—a right that had been specifically recognized by the Supreme Court of Washington in construing similarly-worded undertakings.

Regarding the bank's primary responsibility and the surety companies' corresponding right of subrogation as to the collateral: "In respect to official bonds of state officers, the law of the state where the official gives the bond will be followed by the federal courts." City of Beckley v. Moran, supra. By close parity of reasoning, the bonds of public depositaries in favor of state officers should be construed according to state law, as expounded by the highest tribunal of the commonwealth.

The appellant receiver seeks to minimize the effect of the foregoing Washington decisions by insisting that "the facts as shown by the opinions differ materially from the facts in the present case." On this point the court below, while sustaining the receiver in the latter's contention that the Washington decisions were not controlling upon a federal court, conceded that the facts of the Washington cases and those of the present controversy could not be distinguished. In his memorandum decision, the learned District Judge said:

"The defendant Receiver has asked the Court to distinguish the cited cases from the present suit because of the difference in the provisions of the bonds in those cases and the present. The Court is unable to do so. While they are not worded the same they are substantially to the same effect, as shown by the fact that in the last of the cited cases the first was held controlling."

■ We agree with the lower court that the facts of the Washington cases are not distinguishable from those here presented;

but we also hold that, even in a suit requiring the application of the equitable doctrine of subrogation, they are binding upon a federal court. We think that the lower court's refusal to follow the state decisions was error.

The final question to be here determined concerns the allowance of interest. The appellee county treasurer contends that he should be awarded interest at 6 per cent. on his public deposit "for the period of non-payment or withholding of the county funds after the closing of the bank." The appellant receiver insists that "interest accruing after suspension cannot be paid upon any claim, either secured or unsecured, unless and until all claims against the bank have been paid in full, and there remains a surplus to be applied upon the payment of interest." The appellant surety companies further point out that, in any event, interest is not recoverable on whatever part of the loss is paid from the collateral after the latter passed into the custody of the court, by the interlocutory decree of July 19, 1935.

Since the county treasurer's claim for post-suspension interest is bottomed solely upon the depositary contract already referred to, it is necessary to determine whether, under the national bank laws, the depositary was authorized to enter into a contract of that kind.

At the threshold of our inquiry, however, it might be remarked that we have been referred not even to any state law authorizing banks to agree to pay six per cent. interest on public deposits. The applicable statute is section 5564 of Rem. Comp.Stat. of 1922, which section has not been changed in Rem.Rev.Stat. of 1932. The text of the section follows:

"*Contract as to Interest.* Before any such designation or designations [of county depositary] shall become effectual and entitle said treasurer to make deposits as hereinabove provided, the bank or banks so deposited [designated?] shall also enter into a written contract with the county whose treasurer is to make such deposits, to pay to said county, to be credited to the county expense fund thereof *two* per centum per annum on the average daily balances of all moneys so deposited by such county treasurer in said bank while acting as such depositary; such payments to be made monthly to said county while such deposits continue in such depositary; said contract shall be in such form as shall be approved by the board of county commissioner[s] and the prosecuting attorney of said county." (Italics our own.)

Whatever may be the state law on the subject, however, it is clear that it is definitely contrary to the federal public policy to permit national banks to contract for interest on deposits held by such banks after insolvency.

The applicable federal statute is 12 U.S.C.A. § 194:

"From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the comptroller shall make a *ratable* dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held." (Italics our own.)

Quoting part of the foregoing statute, Mr. Chief Justice Waite, in U. S. (White) v. Knox, 111 U.S. 784, 787, 4 S.Ct. 686, 687, 28 L.Ed. 603, said:

"The business of the bank must stop when insolvency is declared. Rev.St. § 5228. No new debt can be made after that. The only claims the comptroller can recognize in the settlement [of] the affairs of the bank are those which are shown by proof satisfactory to him or by the adjudication of a competent court to have had their origin in something done before the insolvency. It is clearly his duty, therefore, in paying dividends, to take the value of the claim *at that time* as the basis of distribution. If interest is added on one claim after that date before the percentage of dividend is calculated, it should be upon all, otherwise the distribution would be according to different rules, and not *ratably,* as the law requires." (Italics our own.)

Again in Merrill v. National Bank of Jacksonville, 173 U.S. 131, 140, 141, 147, 19 S.Ct. 360, 364, 43 L.Ed. 640, Mr. Chief Justice Fuller said:

"As Judge Taft points out, it is because of the distinction between the right in

personam and the right in rem that interest is only added up to the date. of insolvency, although, after the claims as allowed are paid in full, interest accruing may then be paid before distribution to stockholders. * * *

"Our conclusion is that the claims of creditors are to be determined as of the date of the declaration of insolvency, irrespective of the question whether particular creditors have security or not."

See, also, Chemical Nat. Bank v. Armstrong (C.C.A.6) 59 F. 372, 378, 379, 28 L. R.A. 231; People's Nat. Bank v. Payne (C.C.A.8) 26 F.(2d) 208, 209; Gamble v. Wimberly (C.C.A.4) 44 F.(2d) 329, 331–333; Kershaw v. Jenkins (C.C.A.10) 71 F.(2d) 647, 650; Richman v. First Methodist Episcopal Church (C.C.A.3) 76 F.(2d) 344, 346, certiorari denied, Long v. First Methodist Episcopal Church, 296 U.S. 593, 56 S.Ct. 107, 80 L.Ed. 420.

In support of his contention in favor of the allowance of interest after the bank's insolvency, the treasurer relies upon a single decision—that of Washington-Alaska Bank v. Dexter Horton Nat. Bank (C.C.A.9) 263 F. 304, 306, 307. That case is easily distinguishable from the one at bar. There the national bank was the *plaintiff*, seeking to foreclose a lien on collateral given by a *state* bank. The national bank laws dealing with the question of interest, after insolvency, on deposits held by a national bank, were therefore not involved in that suit.

Accordingly, we hold that the court below erred in allowing the appellees any interest on their deposit from January 22, 1932, the closing date of the bank, without an express reservation that such interest would be allowable only in the event that all claims as allowed against the bank are paid in full. Should such a situation arise, we further hold that interest at 6 per centum on the deposit liability as it stood on the date of suspension, may be awarded to the appellees, before the assets of the bank are distributed to stockholders.

Quite a different situation, however, is presented by the receiver's failure to pay declared dividends promptly to the appellees. While admitting that dividends were not paid to the appellees as declared, the receiver seeks to excuse that delay upon the ground that, "Inasmuch as it was not possible to adjust the measure of the separate liabilities by agreement, there was no basis upon which a receiver's certificate could issue."

Mere controversy as to the exact amount of a creditor's claim, however, does not deprive the creditor of his right to interest upon dividends that are not paid as declared. The purpose of this interest allowance is not to punish the receiver or the insolvent, but to place all creditors upon an equal footing. This principle of equality among creditors is the leitmotiv that runs through the national bank laws and the decisions thereunder.

In Armstrong v. American Exchange Nat. Bank, 133 U.S. 433, 470, 10 S.Ct. 450, 462, 33 L.Ed. 747, the court said:

"In the present case the claims of the plaintiff, as allowed, do not include interest beyond the date when the bank failed. Interest upon the dividend which it ought to have received on the 31st of October, 1887, is a different matter. The allowance of that interest is necessary to put the plaintiff on an equality with the other creditors."

The court below held that "there is no liability on the part of the receiver * * for the payment of such interest on account of dividends, the payment of which to plaintiffs was deferred * * *" We think that the court erred in· this respect, and that interest on deferred dividends should be paid out of the proceeds from the collateral, at the legal rate of 6 per cent. Dunnagan v. Best (D.C.) 59 F.(2d) 795, 796, 797.

Summarizing the . views hereinabove expressed, we hold that the decree of the court below should be affirmed, with the following modifications:

1. That appellees have judgment against appellant P. J. Mourant, as receiver of the Olympia National Bank, in the principal sum of $38,684.26, together with interest on the sum of $10,878.28 from October 5, 1932, to June 9, 1934, and on the sum of $5,439.14 from April 24, 1934, to August 18, 1935, and on the sum of $5,439.14 from March 4, 1935, to August 18, 1935, at the rate of 6 per cent. per annum, and for their costs, both in this court and in the courts below.

2. That said receiver be directed and required to pay the entire amount of said judgment from the proceeds of the sale of the securities pledged to appellees by said bank and thereafter delivered to the said P. J. Mourant as special master, and that,

to effect such payment, said special master be directed and required to sell all of said securities now remaining unsold and to pay over the proceeds thereof to himself, as receiver, to be applied, so far as necessary, to the payment of said judgment, the balance, if any, to be used in the further liquidation of said bank.

3. That if and when all claims allowed against said bank, including the above mentioned judgment, shall have been paid in full, said receiver shall be directed and required to pay to appellees, out of the assets of said bank then remaining in his hands, interest on the sum of $60,444.15 from January 22, 1932, to October 5, 1932, and on the sum of $49,565.87 from October 5, 1932, to April 24, 1934, and on the sum of $44,126.73 from April 24, 1934, to March 4, 1935, and on the sum of $38,684.26 from March 4, 1935, until paid, at the rate of 6 per cent. per annum.

4. That appellants New Amsterdam Casualty Company, Hartford Accident & Indemnity Company, Great American Indemnity Company, and the Fidelity & Casualty Company of New York recover of appellant P. J. Mourant, as receiver of said bank, their costs, both in this court and in the courts below.

As thus modified, the decree is affirmed.